[No. A048789. First Dist., Div. Three. Aug. 5, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH EDWARDS BARNEY, Defendant and Appellant.

[No. A050201. First Dist., Div. Three. Aug. 5, 1992.]

THE PEOPLE, Plaintiff and Respondent v.
KEVIN O'NEAL HOWARD, Defendant and Appellant.

[Opinion certified for partial publication.†]

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part V.

800

**COUNSEL**

Victor Blumenkrantz and Linda F. Robertson, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Frederick R. Millar, Jr., Gerald A. Engler and Enid A. Camps, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda), and Rockne P. Harmon, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

CHIN, J.—

## I. INTRODUCTION

These two appeals challenge the admissibility of deoxyribonucleic acid (DNA) analysis evidence. The primary claim is that DNA analysis is a new scientific technique which does not meet the test of general acceptance prescribed by *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. We conclude that one element of current DNA analysis—the determination of the statistical significance of a match between a defendant's DNA and the DNA in bodily material found at the crime scene—does not satisfy the *Kelly-Frye* test, but that in both appeals the error in admitting the DNA evidence was harmless.

The two cases are factually unrelated. They were tried separately by two different judges in Alameda County and have been briefed separately. However, we have consolidated them for decision because there is substantial identity of issues presented and underlying scientific principles.

## II. Facts and Procedure

### A. *People* v. *Howard*

The victim in *Howard*, Octavia Matthews, was found on the floor of her home with a rope wrapped around her neck, bleeding from multiple head wounds. She later died of "[b]lunt trauma to the head associated with asphixia due to blunt trauma to the neck."

Kevin O'Neal Howard was Matthews's tenant in another building. He was behind in his rent payments and was living from paycheck to paycheck, and had previously been served with an eviction notice. Howard's wallet was found at the crime scene under some newspaper on a bloodstained couch. His fingerprint was found on a postcard in an upstairs bedroom. At the time of his arrest he had a fresh cut on one of his fingers. Conventional blood group analysis indicated that Howard's blood and some of the crime scene bloodstains—located on a tile floor, a paper napkin found in a cosmetics case, and a tissue found in a purse—shared an unusual blood type found in approximately 1.2 persons out of 1,000 in the Black population (and not at all in the White population). DNA analysis by the Federal Bureau of Investigation (FBI) indicated that Howard's DNA pattern matched the DNA pattern in those bloodstains, and the frequency of such a pattern is 1 in 200 million in the Black population.

The trial court held a *Kelly-Frye* hearing on the admissibility of the DNA evidence. The court heard expert testimony from both sides, and also admitted transcripts of the previous *Kelly-Frye* hearings in *People* v. *Barney* and a Ventura County case, *People* v. *Axell* (1991) 235 Cal.App.3d 836 [1 Cal.Rptr.2d 411]. The court ruled that *Kelly-Frye* was satisfied and that the evidence was admissible.

At trial, Howard testified in his own behalf as follows. He had gone to Matthews's home to discuss his rent and get a receipt for a prior payment. In the course of searching for a receipt already in his possession, he emptied the contents of a pouch filled with his personal items, including his wallet, which he accidentally left at the scene. He never attacked Matthews, and she was alive when he left. He often cuts himself with wire on his job, but his finger was not bleeding on the night of the killing. Howard also presented a defense suggesting that another of Matthews's tenants may have committed the homicide.

A jury convicted Howard of second degree murder (Pen. Code, § 187) with great bodily injury (Pen. Code, § 1203.075). The court imposed a prison sentence of 15 years to life.

## B. *People* v. *Barney*

The victim in *Barney* was accosted in the South Hayward Bay Area Rapid Transit (BART) parking lot as she entered her car. Ralph Edwards Barney forced his way into the car and demanded money, displayed a knife, and forced the victim to drive and park several blocks away, where he penetrated her vagina with his fingers, attempted unsuccessfully to rape her and force her to perform oral copulation, and ejaculated on her clothing. When he left he took her small change in the approximate sum of $2, her BART ticket with $3.80 remaining on it, and her car keys.

The victim found Barney's wallet on the floor of her car. She called the police from a telephone booth. When officers arrived, she identified Barney from a photograph on an identification card in the wallet. Officers were dispatched to the address on the identification card, where Barney was arrested. The police seized a knife, a BART ticket with $2.20 remaining on it, and $1.82 in small change found in Barney's possession and on his front porch. The BART ticket had last been used to enter the transit system at the South Hayward BART station. BART fare between that station and stations near Barney's address was $1.60, the same amount by which the victim's BART ticket was reduced after the assault.

The police took Barney to BART police headquarters, where the victim identified him as her assailant. She subsequently identified him at a lineup, at the preliminary examination, and at trial. At a pretrial display of knives, she identified two knives, one of which was the seized knife. She identified the seized BART ticket at trial. DNA analysis by a commercial entity, Cellmark Diagnostics (Cellmark), indicated that Barney's DNA pattern matched the DNA pattern in semen found on the victim's clothing, and the frequency of such a pattern is 1 in 7.8 million in the Black population.

The trial court held a *Kelly-Frye* hearing on the admissibility of the DNA evidence, at which it heard expert testimony from both sides and also admitted transcripts of the previous *Kelly-Frye* hearing in *People* v. *Axell*, *supra*, 235 Cal.App.3d 836. The court ruled that *Kelly-Frye* was satisfied and that the evidence was admissible. The court excluded the victim's BART police station identification of Barney on the ground the one-person showup was impermissibly suggestive, but concluded the other identifications were untainted and were therefore admissible.

After a nonjury trial, the court convicted Barney of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)), robbery (Pen. Code, § 211), vaginal penetration with a foreign object (Pen. Code, § 289), attempted rape (Pen.

Code, §§ 261, 664) and attempted forcible oral copulation (Pen. Code, §§ 288a, 664). The court imposed a prison sentence of life with possibility of parole for kidnapping to commit robbery, plus a total of 18 years for the other offenses and enhancements, with the life sentence to be served after completion of the 18-year term (Pen. Code, § 669).

### III.   OVERVIEW OF DNA ANALYSIS

Before addressing the DNA issues presented in these appeals, an explanation of DNA analysis is essential.[1]

DNA analysis (also called DNA fingerprinting or typing) is a process by which characteristics of a suspect's genetic structure are identified, are compared with samples taken from a crime scene, and, if there is a match, are subjected to statistical analysis to determine the frequency with which they occur in the general population.

Every human cell that has a nucleus contains two sets of chromosomes—one set inherited from each parent. Each chromosome contains thousands of genes, each of which comprises a particular site on the chromosome. The molecular component of the chromosome and its genes is DNA.

The DNA molecule resembles a spiral staircase. It consists of two parallel spiral sides (i.e., a double helix) composed of repeated sequences of phosphate and sugar. The two sides are connected by a series of rungs, which constitute the steps in the staircase. Each rung consists of a pair of chemical components called bases. There are four types of bases—adenine (A), cytosine (C), guanine (G), and thymine (T). A will pair only with T, and C will pair only with G.

Thus, the DNA molecule consists of two parallel spiral sides connected by a series of A-T, T-A, C-G, and G-C rungs called base pairs. There are about three billion base pairs in a single DNA molecule.

A person's individual genetic traits are determined by the sequence of base pairs in his or her DNA molecules. That sequence is the same in each molecule regardless of its source (e.g., hair, skin, blood, or semen) and is unique to the individual. Except for identical twins, no two human beings have identical sequences of all base pairs.

---

[1]See generally, *People* v. *Axell, supra,* 235 Cal.App.3d at pages 844-848; *U.S.* v. *Jakobetz* (2d Cir. 1992) 955 F.2d 786, 791-800 (petn. for cert. pending); Lewontin & Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at page 1745; Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991) Science, at page 1735.

In most portions of DNA, the sequence of base pairs is the same for everyone. Those portions are responsible for shared traits such as arms and legs. In certain regions, however, the sequence of base pairs varies from person to person, resulting in individual traits. A region—or locus—that is variable is said to be polymorphic. In some polymorphic loci, at fragments called alleles, short sequences of base pairs repeat for varying numbers of times. These are called variable number of tandem repeat (VNTR) sequences. As a result of VNTR sequencing, the *length* of a given allele, measured in numbers of base pairs, will vary from person to person.

This variance is what makes DNA analysis possible. In effect, the lengths of sets of multiple (usually eight) polymorphic fragments (or VNTR alleles) obtained from a suspect's DNA and from crime scene samples are compared to see if any sets match, and a match is accorded statistical significance.

There are three discrete steps in DNA analysis as performed by the FBI in *Howard* and by Cellmark in *Barney*: (1) *processing* of DNA from the suspect and the crime scene to produce X-ray films which indicate the lengths of the polymorphic fragments; (2) examination of the films to determine whether any sets of fragments *match*; and (3) if there is a match, determination of the match's *statistical significance*.

### A. Processing

The DNA processing step consists of the following substeps:

#### 1. Extraction

DNA is extracted from bodily material such as hair, skin, blood, or semen by application of chemical enzymes.

#### 2. Restriction

The extracted DNA is "cut" into thousands of fragments at specific points by application of restriction enzymes. The restriction enzymes act as "chemical scissors" in that they sever the DNA at targeted base-pair sites. This substep gives its name to the overall DNA analytical process: restrictive fragment length polymorphism (RFLP) analysis.

#### 3. Electrophoresis

The DNA fragments are separated by size through a process called electrophoresis. The various sample fragments being tested are placed in

separate lanes on one end of a gel slab and an electrical current is applied, causing the fragments to move across the gel. Shorter fragments move farther than longer fragments. Thus, at the completion of electrophoresis, the sample fragments are arrayed across the gel according to size.

In addition to the sample fragments, other fragments called size markers, which have known base-pair lengths, are placed in separate lanes on the gel in order to facilitate measurement of the sample fragments. The array of size markers across the gel provides points of comparison, which permit assessment of the base-pair lengths of the sample fragments.

### 4. Southern transfer and denaturing

To facilitate handling of the DNA fragments, a nylon membrane is placed on the gel, and by wicking action the fragments are transferred to the membrane, becoming permanently fixed in their respective positions. This process is called Southern transfer (named for the scientist who developed it).

During this step, each DNA fragment is separated at its bases into two parts—i.e., is "unzipped" into two single strands—through a chemical process called denaturing.

### 5. Hybridization

The last two substeps enable visualization of the lengths of the sample DNA fragments by producing X-ray films which show the distance the fragments traveled as a result of electrophoresis. In the hybridization substep, four types of radioactive single-stranded DNA fragments called probes, which have known base-pair sequences that occur at only one location on DNA, are applied to the nylon membrane. The probes seek out sample fragments that have complementary base-pair sequences and attach to them.

Each type of probe will normally attach to two sample fragments, one contributed by each parent. Occasionally, however, where parents contributed the same information (i.e., identical fragments) for a particular trait, the probe will attach to only one fragment. In the former situation the polymorphic locus is said to be heterozygous, in the latter case it is said to be homozygous.

### 6. Autoradiography

The hybridization process is repeated four times, once for each type of probe. Each time, an X-ray film called an autoradiograph (or autorad) is

made of the nylon membrane, so that there are four X-ray films. (Cellmark also makes a preliminary single X-ray film from a simultaneous "cocktail" application of all four probes.)

An attached probe's radioactivity will reveal the location of the probe—and hence the location of the sample fragment to which it attached—on the nylon membrane. The radioactivity shows up as a line or band on the X-ray film.

There will normally be two bands for each of the four probes, producing a total of eight bands arrayed across the four films. Occasionally, where a locus is homozygous, there will be only one band for a probe.

The location of a band on the X-ray film indicates the distance a fragment traveled as a result of electrophoresis, and hence the length of the fragment. The size-marker fragments also appear on the films, enabling measurement of the base-pair lengths of the sample fragments.

The end result of the processing substeps is a picture of a person's DNA pattern (which may be produced by overlaying the four X-ray films). Each pattern consists of a series of bands (usually eight) representative of a few selected bits of DNA (not the whole molecule). The bands are arrayed in varying positions, which indicate the distance the selected DNA fragments traveled during electrophoresis and hence the various lengths of the fragments.

## B.  *Matching*

The second step of DNA analysis is to compare the DNA patterns produced by the processing step in order to determine whether the suspect's DNA pattern matches the DNA pattern of bodily material found at the crime scene.

First, the patterns are visually evaluated (i.e., "eyeballed") to determine whether there is a likely match. Most exclusions will be obvious, since the patterns will be noticeably different. If there is not an obvious exclusion, the bands in the patterns are subjected to computer-assisted analysis to determine the length of the represented DNA fragments as measured in base-pair units. The measurements are taken by comparing the bands for the sample fragments with the bands for the size-marker fragments of known base-pair lengths.

Because of inherent limitations in the DNA processing system, it is not possible to measure the sample fragments to the precise number of base

pairs. Thus, a margin of error is built into the matching system. Fragments being compared need not have been assigned precisely the same base-pair length for a match to be declared. For example, the FBI laboratory will declare a match within a "match window" if two fragments differ in base-pair length by less than 2.5 percent.

It is not particularly uncommon for two people to share the same lengths for two fragments, but it is very unusual to share the same lengths for all eight fragments. Thus, if all of the suspect's fragment lengths are the same as the crime scene fragment lengths within the margin of error—i.e., if the band patterns produced by the processing step are identical—a match is declared.

## C.   *Statistical Analysis*

The final step is to determine the statistical significance of a match, i.e., how unlikely it is that the crime scene samples came from a third party who had the same DNA pattern as the suspect.

To make this determination, the FBI and Cellmark calculate how frequently each pair of bands produced by one probe is found in a target population. This is accomplished by assigning each band to a category comprising a defined range of base-pair lengths—called a bin—and then determining how often bands within that bin appear in a data base composed of persons of a given race.

Data bases are maintained in broad racial categories such as Caucasian, Black, and Hispanic. For example, the data base for Blacks used by the FBI in *Howard* was composed of some 300 persons from South Carolina, Miami, and Texas, while the Black data base used by Cellmark in *Barney* was composed of some 300 persons from Detroit and other locations. In compiling a data base, the FBI and Cellmark processed DNA pattern bands for each member, assigned the bands to appropriate bins, and then calculated the frequency of occurrence within the data base for bands assigned to a given bin.

The statistical significance of a match—i.e., the frequency with which an entire pattern of bands occurs in a target population—is determined by a series of calculations. Assuming four sets of two bands have been produced by the processing step, the two frequencies for each set of bands—as calculated through the bin method—are multiplied, using a version of a standard population genetics equation called the Hardy-Weinberg equation. The resulting four numbers are then multiplied together—this method is called the product rule—to reflect the total frequency with which the entire DNA pattern appears in the target population.

This procedure produces extremely small match probabilities, as demonstrated in the present appeals (1 in 200 million in *Howard* and 1 in 7.8 million in *Barney*).

## IV. DNA ISSUES

Howard and Barney raise almost identical issues pertaining to the question whether there is general scientific acceptance of DNA analysis and the adequacy of the *Kelly-Frye* hearing in each case. There are also several non-DNA issues, which are addressed in unpublished portions of this opinion.

### A. Basic Kelly-Frye Principles

We begin with a few basic principles pertaining to admission of the DNA evidence. ■ "[A]dmissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30, original italics.) "[R]eliability" means that the technique " '. . . must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*Ibid.,* italics added by the *Kelly* court, quoting *Frye* v. *United States, supra,* 293 Fed. at p. 1014.)

■ The existence of "general acceptance" is subject to limited de novo review on appeal. Ordinarily, the appellate court will confine its review to the record, independently determining from the trial evidence whether the challenged scientific technique is generally accepted. Occasionally, however, it may be necessary for the appellate court to review scientific literature outside the record. The goal is not to decide the actual reliability of the new technique, but simply to determine whether the technique is generally accepted in the relevant scientific community. If the scientific literature discloses that the technique is deemed unreliable by " 'scientists significant either in number or expertise . . . ,' " the court may safely conclude there is no general acceptance. (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1134 [242 Cal.Rptr. 496], quoting *People* v. *Shirley* (1982) 31 Cal.3d 18, 56 [181

Cal.Rptr. 243, 723 P.2d 1354].) Even if the technique was previously determined correctly to have been generally accepted, the converse may subsequently be shown by evidence "reflecting a change in the attitude of the scientific community." (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 32.)[2]

### B. *People* v. *Axell and the Processing/Matching Steps*

Most of the DNA issues in *Howard* and *Barney* have been addressed by the recent appellate decision in *People* v. *Axell*, *supra*, 235 Cal.App.3d 836.

The defendant in *Axell* challenged the admissibility of DNA analysis evidence produced by Cellmark, the same laboratory that produced the DNA evidence in *Barney*. Cellmark determined that Lynda Axell's DNA pattern matched the DNA pattern in hairs found at the crime scene, and the frequency of such a pattern is 1 in 6 billion in the Hispanic population. (*People* v. *Axell*, *supra*, 235 Cal.App.3d at p. 844.) After conducting a *Kelly-Frye* hearing, the trial court ruled that the evidence was admissible. On appeal, the defendant raised essentially the same admissibility issues that have been raised in *Howard* and *Barney*. Indeed, the state of the evidence in all three cases is substantially the same, since the record of the *Kelly-Frye* hearing in *Axell* was admitted in both of the present cases.

We first address a series of issues raised in *Howard* and *Barney* regarding the adequacy of the prosecution evidence and the question whether there is general scientific acceptance of the first two steps of DNA analysis as performed by the FBI and Cellmark, the *processing* step and the *matching* step. As to each issue, we are generally satisfied with the response in *Axell* and shall defer to our colleagues in that case, with some additional comments of our own.

### 1. *Bias of prosecution witnesses*

■ Howard contends the prosecution failed to meet its *Kelly-Frye* burden because its two expert witnesses were FBI employees and thus were unacceptably biased. The same point was raised in *Axell*, where two of the prosecution's six witnesses had been Cellmark employees.

Here, as in *Axell*, "the trial court did not rest its decision on the testimony of a sole or crucial witness who has a significant financial or professional interest in promoting the new technique or one that lacks theoretical training.

---

[2]Because of the de novo nature of our review, it is inconsequential that, according to Howard's opening brief, the *Howard* trial court did not address the question of general scientific acceptance "except in the most tangential manner."

[Citations.]" (*People* v. *Axell, supra*, 235 Cal.App.3d at p. 859.) The record was replete with other evidence from the *Kelly-Frye* hearings in *Axell* and *Barney* as well as pertinent scientific literature. In any event, " '. . . "[A] certain degree of 'interest' must be tolerated if scientists familiar with the theory and practice of a new technique are to testify at all." ' [Citation.]" (*Axell, supra*, at p. 859, quoting *People* v. *Reilly, supra*, 196 Cal.App.3d at p. 1140.)

Clearly there was some level of self-interest underlying the testimony of the two FBI experts, but that point went to the weight to be attributed to the testimony rather than its admissibility. (See *People* v. *Reilly, supra*, 196 Cal.App.3d at p. 1140, fn. 3 & accompanying text.)

### 2. *Standards/guidelines/controls and proficiency tests*

■   Howard and Barney both contend there is a current lack of generally accepted standards, guidelines, and controls pertaining to analysis performed by DNA testing laboratories, and the result is a lack of general scientific acceptance of DNA analysis techniques. Howard also asserts that until recently the FBI laboratory has not been subjected to independent external proficiency testing, and Barney points out that proficiency testing of the Cellmark laboratory has revealed isolated instances in which "false positives" (i.e., incorrect matches) were declared.

Similar claims were asserted unsuccessfully in *Axell*. (*People* v. *Axell, supra*, 235 Cal.App.3d at pp. 857, 861, 863.) Each point is broadly addressed by *Axell*'s conclusion, based on the prosecution's evidence, that if Cellmark's prescribed procedures are followed, it is "extremely unlikely" that a match might be declared erroneously. (*Id.*, at p. 860.)

These points are discussed in a new report on DNA analysis by the National Research Council (NRC). (NRC, DNA Technology in Forensic Science (1992) (hereafter NRC report).) The NRC report concludes there is indeed a need for standardization of laboratory procedures and proficiency testing (as well as appropriate accreditation of laboratories) to assure the quality of DNA laboratory analysis. (*Id.*, at pp. 16, 98, 108-109.)[3] But the absence of such safeguards does not mean DNA analysis is not generally accepted. To the contrary, the NRC report concludes that "[t]he current laboratory procedure for detecting DNA variation . . . is fundamentally sound . . . ." (*Id.*, at p. 149.) Rather, the absence of these safeguards goes to the question whether a laboratory has complied with generally accepted

---

[3]The NRC report also recommends that laboratory error rates as determined by proficiency testing should be disclosed to juries. (*Id.*, at pp. 14, 89, 94, 95.)

standards in a given case (*id.*, at pp. 106-109), or, stated in *Kelly-Frye* terms, whether the prosecutor has shown that "correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 30; see *post*, pp. 822-825.)

### 3. *Failure to publish*

■ Howard and Barney contend general scientific acceptance is precluded by the failure of the FBI and Cellmark to publish in peer review journals and otherwise share their data and methodology. The same assertion in *Axell* was unsuccessful as to Cellmark, the appellate court concluding that Cellmark had made information "available to defendants in criminal cases." (*People* v. *Axell*, *supra*, 235 Cal.App.3d at p. 861.)

As for the FBI, the Attorney General correctly points out there have been numerous published articles on DNA analysis as performed by the FBI, of which we have taken judicial notice.

### 4. *The matching systems*

■ Howard and Barney contend there is no general acceptance as to the systems employed by the FBI and Cellmark for declaring a match of DNA patterns. Specifically, they claim there is a lack of consensus regarding (1) match criteria (e.g., the FBI's 2.5 percent match window), (2) the extent to which there is a possibility of declaring false positives, (3) the problem of band shift (the phenomenon of DNA fragments from the same source moving different distances during electrophoresis and thus becoming misaligned), and the possibility that it might lead to a false positive, and (4) situations where there are missing, extra, or indistinct bands. Barney adds a claim that there was no general acceptance of Cellmark's previous method of using a ruler and a computerized formula to measure bands (Cellmark now uses computer analysis).

These points are broadly addressed by the conclusion in *Axell*, based on the prosecution's expert testimony in that case, that "it is extremely unlikely if the procedures described in Cellmark's protocol are followed that an erroneous match could result from contamination or degradation of the DNA sample, from incomplete or partial digestion by the restriction enzyme, from star activity (where restriction enzyme recognizes additional sites), or aberrant band mobility as these phenomena would be detectable from the results if not at an earlier stage or by appearance of the autorad." (*People* v. *Axell*, *supra*, 235 Cal.App.3d at p. 860.) The court additionally concluded that "[a]ppellant's challenge to the subjectivity of interpreting a match does not

invalidate the procedure" because "interpretation of bands on an autorad is fairly straightforward and involves a minimal amount of subjective analysis." (*Id.*, at pp. 864-865.)

The NRC report states there is a need for "an objective and quantitative rule for deciding whether two samples match." (NRC rep., *supra*, at p. 54; see also *id.*, at pp. 61, 72.) But, again, the report does not equate the absence of a standardized rule with a lack of general acceptance as to the matching step of DNA analysis. The use of match criteria in a given case is properly addressed as part of the inquiry whether "correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 30; see *post*, pp. 35-40.)

### C. *General Acceptance and Statistical Analysis*

This brings us to the heart of these appeals, the question whether the third step of DNA analysis—the determination of a match's *statistical significance* —has received general scientific acceptance.

#### 1. *The current scientific debate*

There is currently a fundamental disagreement among population geneticists concerning the determination of the statistical significance of a match of DNA patterns. The dispute was recently featured in a leading scientific journal, Science, in which Richard C. Lewontin of Harvard University and Daniel L. Hartl of Washington University attack the reliability of DNA statistical analysis, while Ranajit Chakraborty of the University of Texas and Kenneth K. Kidd of Yale University defend it. (Lewontin & Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at p. 1745 (hereafter Lewontin & Hartl); Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991) Science, at p. 1735 (hereafter Chakraborty & Kidd).)

Lewontin and Hartl question the reliability of the current method of multiplying together the frequencies with which each band representative of a DNA fragment appears in a broad data base. The problem, they say, is that this method is based on incorrect assumptions that (1) members of the racial groups represented by the broad data bases—Caucasians, Blacks, and Hispanics—mate within their groups at random, i.e., without regard to religion, ethnicity, and geography, and (2) the DNA fragments identified by DNA processing behave independently and thus are "independent in a statistical sense"—i.e., in the language of population genetics, they are in " 'linkage equilibrium.' " (Lewontin & Hartl, *supra*, at p. 1746.)

Lewontin and Hartl claim that, contrary to the assumption of random mating, ethnic subgroups within each data base tend to mate endogamously (i.e., within a specific subgroup) with persons of like religion or ethnicity or who live within close geographical distance. Such endogamous mating tends to maintain genetic differences between subgroups—or substructuring—which existed when ancestral populations emigrated to the United States and has not yet had sufficient time to dissipate. As a result, the subgroups may have substantial differences in the frequency of a given DNA fragment—or VNTR allele—identified in the processing step of DNA analysis. A given VNTR allele may be relatively common in some subgroups but not in the broader data base. (Lewontin & Hartl, *supra*, at pp. 1747-1749.)

There are purportedly two consequences of genetic substructuring and subgroup differences in allele frequencies: (1) it is inappropriate to use broad data bases to which all Caucasians, Blacks, and Hispanics may be referred for estimating frequencies, and (2) it is inappropriate to multiply frequencies together, for want of linkage equilibrium. The current multiplication method, using the Hardy-Weinberg equation (which requires statistical independence within a locus, or Hardy-Weinberg equilibrium) and the product rule (which requires statistical independence across loci, or linkage equilibrium) will be reliable only if there is extensive study of VNTR allele frequencies in a wide variety of ethnic subgroups. (Lewontin & Hartl, *supra*, at pp. 1748-1749.)

Lewontin and Hartl conclude that because the frequency of a given VNTR allele may differ among subgroups, reference to a broad data base may produce an inaccurate frequency estimate for a defendant's subgroup. The current multiplication method may greatly magnify the error. The resulting probability for the defendant's entire DNA pattern may be in error by two or more orders of magnitude (e.g., 1 in 7.8 million could really be 1 in 78,000). (Lewontin & Hartl, *supra*, at p. 1749.)

Chakraborty and Kidd strongly disagree. They contend that Lewontin and Hartl exaggerate both the extent of endogamy in contemporary America and the effect of substructuring on the reliability of DNA statistical analysis. They concede there is substructuring (and thus variance of VNTR allele frequencies) within the data bases, but assert its effect on the reliability of frequency estimates is "trivial" and "cannot be detected in practice." (Chakraborty & Kidd, *supra*, at pp. 1736-1738.)

In an article introducing the Lewontin-Hartl and Chakroborty-Kidd articles, Science describes Lewontin and Hartl as "two of the leading lights of population genetics" who "have the support of numerous colleagues." (Roberts, *Fight Erupts Over DNA Fingerprinting* (Dec. 20, 1991) Science, at p.

1721 (hereafter *Fight Erupts*).) A population geneticist at the University of California at Irvine is said to agree "that the current statistical methods could result in 'tremendous' errors and should not be used without more empirical data." (*Id.*, at p. 1723.) The introductory article describes the debate as "bitter" and "raging," stating that "tempers are flaring, charges and counter-charges are flying. . . . [¶] Dispassionate observers, who are few and far between, say that the technical arguments on both sides have merit. . . . [T]he debate is not about right and wrong but about different standards of proof, with the purists on one side demanding scientific accuracy and the technologists on the other saying approximations are good enough." (*Id.*, at p. 1721.) Science concludes that the Lewontin-Hartl and Chakraborty-Kidd articles "seem likely to reinforce the notion that the [scientific] community is indeed divided" under the *Frye* standard, although the issue may become moot within a few years "with the expected introduction of even more powerful DNA techniques . . . ." (*Id.*, at p. 1723.)

The NRC report, which was released four months after the Science articles, acknowledges there is a "[s]ubstantial controversy" concerning the present method of statistical analysis. (NRC rep., *supra*, at p. 74.) The report does not, however, choose sides in the debate, but instead "assume[s] for the sake of discussion that population substructure may exist . . . ." (NRC rep., *supra*, at pp. 12, 80; see also *id.*, at p. 94.)

### 2. *The contentions in the present appeals*

Briefing in the present appeals predated the appearance of the Science articles and the NRC report, on which we have solicited comment from the parties. (Gov. Code, § 68081.) However, the challenges asserted by Howard and Barney to the third step of DNA analysis, both below and on appeal, are essentially the same as the points raised by Lewontin and Hartl. Howard and Barney claim there is no general scientific acceptance as to (1) use of the Hardy-Weinberg equation in light of genetic substructuring, (2) use of the product rule and the assumption that probed-for DNA fragments are in linkage equilibrium, (3) the size and composition of the FBI and Cellmark data bases, (4) the failure to provide confidence levels (i.e., upper and lower ranges) for frequency estimates, and (5) the degree to which conservative calculation methods employed by the FBI and Cellmark compensate for the possibility of frequency underestimates. They also argue that use of the product rule is precluded by *People* v. *Collins* (1968) 68 Cal.2d 319, 327-329 [66 Cal.Rptr. 497, 438 P.2d 33], for want of an adequate evidentiary foundation or proof of statistical independence. Barney adds a challenge to the size of Cellmark's bin categories for base-pair lengths.

Each of these points is in some way covered in the Science debate between Lewontin-Hartl and Chakraborty-Kidd. We shall therefore address

appellants' claims by focusing on that debate and its implications for the present appeals.

### 3. *The applicability of Kelly-Frye*

A threshold issue is whether the *Kelly-Frye* requirement of general scientific acceptance applies at all to the statistical calculation step of DNA analysis. If not, the current scientific debate would go only to the weight of DNA evidence, not its admissibility, and would be a matter for jury consideration.

The appellate court in *Axell* addressed the statistical issues presented here, albeit before publication of the Science articles. The court concluded that "since a match between two DNA samples means little without data on probability, the calculation of statistical probability is an integral part of the process and the underlying method of arriving at that calculation must pass muster under *Kelly/Frye*." (*People* v. *Axell, supra,* 235 Cal.App.3d at pp. 866-867.)

We agree. The statistical calculation step is the pivotal element of DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns. (NRC rep., *supra,* at p. 74.) It is the expression of statistical meaning, stated in terms of vanishingly small match probabilities, that makes the evidence so compelling. To say that the frequency of Howard's DNA pattern is 1 in 200 million in the Black population is tantamount to saying his pattern is totally unique, and thus *only he* could have been the source of the crime scene bloodstains that did not match those of the victim.

To end the *Kelly-Frye* inquiry at the matching step, and leave it to jurors to assess the current scientific debate on statistical calculation as a matter of weight rather than admissibility, would stand *Kelly-Frye* on its head. We would be asking jurors to do what judges carefully avoid—decide the substantive merits of competing scientific opinion as to the reliability of a novel method of scientific proof. We cannot reasonably ask the average juror to decide such arcane questions as whether genetic substructuring and linkage disequilibrium preclude use of the Hardy-Weinberg equation and the product rule, when we ourselves have struggled to grasp these concepts. The result would be predictable. The jury would simply skip to the bottom line—the only aspect of the process that is readily understood—and look at the ultimate expression of match probability, without competently assessing the reliability of the process by which the laboratory got to the bottom line. This is an instance in which the method of scientific proof is so impenetrable

that it would " '. . . assume a posture of mystic infallibility in the eyes of a jury . . . .' [Citation.]" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32, quoting *United States* v. *Addison* (D.C. Cir. 1974) 498 F.2d 741, 744 [162 App.D.C. 199].) It is the task of scientists—not judges, and not jurors—to assess reliability. " 'The requirement of general acceptance in the scientific community assures that *those most qualified to assess the general validity of a scientific method will have the determinative voice. . . .'* " (*Kelly, supra,* at p. 31, italics added by the *Kelly* court, quoting *Addison, supra,* at pp. 743-744.)

Might the statistical calculation step be distinguished from the processing and matching steps for *Kelly-Frye* purposes on the ground that only the first two steps produce novel scientific evidence while the third step is merely interpretative? Again, such an approach would subvert *Kelly-Frye.* The evidence produced by DNA analysis is not merely the raw data of matching bands on autoradiographs but encompasses the ultimate expression of the statistical significance of a match, in the same way that polygraph evidence is not merely the raw data produced by a polygraph machine but encompasses the operator's ultimate expression of opinion whether the subject is telling the truth. Were we to terminate the *Kelly-Frye* inquiry short of the interpretative steps in new methods of scientific proof, *Kelly-Frye* would lose much of its efficacy as a tool of "considerable judicial caution" and of an "essentially conservative nature" that is "deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 31.)

### 4. *General scientific acceptance*

Having concluded that *Kelly-Frye* applies to the statistical calculation step of DNA analysis, we proceed to the *Kelly-Frye* inquiry—whether the process of statistical calculation employed by the FBI and Cellmark has gained general acceptance in the field of population genetics. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30; *Frye* v. *United States, supra,* 293 Fed. at p. 1014.)

The Science articles of December 1991 vividly demonstrate not merely a current absence of general acceptance, but the presence of a "bitter" and "raging" disagreement among population geneticists. (*Fight Erupts, supra,* at p. 1721.) According to Lewontin and Hartl, the statistical calculation process is fundamentally flawed because—due to genetic substructuring and linkage disequilibrium—the use of broad data bases and the current multiplication method results in unreliable frequency estimates that may be in error by two or more orders of magnitude. In simple terms, the "bottom line" expression of statistical significance in DNA analysis is claimed to be tremendously unreliable.

Evidently, Lewontin and Hartl—along with their colleagues who agree with them—are significant in both " 'number' " and " 'expertise.' " (*People v. Reilly, supra*, 196 Cal.App.3d at p. 1134.) Science describes Lewontin and Hartl as "two of the leading lights of population genetics" who "have the support of numerous colleagues," and quotes a third population geneticist (Francisco Ayala) who agrees with the above criticism. (*Fight Erupts, supra*, at p. 1721.) Lewontin has been described by one of his colleagues as " 'probably regarded as the most important intellectual force in population genetics alive.' " (*U.S. v. Yee* (N.D.Ohio 1991) 134 F.R.D. 161, 181.) Similar criticisms of the statistical calculation process of DNA analysis have been leveled by other scientists in previous publications, some of which were admitted in evidence below (e.g., Lander, *DNA Fingerprinting on Trial* (June 15, 1989) Nature, at pp. 501, 504; Cohen, *DNA Fingerprinting for Forensic Identification: Potential Effects on Data Interpretation of Subpopulation Heterogeneity and Band Number Variability* (1990) 46 Am. J. Hum. Genetics 358, 367), and in expert testimony at the *Kelly-Frye* hearings in *Howard* (Laurence Mueller), in *Barney* (Steve Selvin and Laurence Mueller) and in *Axell* (Diane Lavett, Charles Taylor, Seymour Geisser, and Laurence Mueller). (*People v. Axell, supra*, 235 Cal.Ap p.3d at pp. 850-851.)

Of course, Chakraborty and Kidd strongly disagree, and according to Science they have "many scientific supporters." (*Fight Erupts, supra*, at p. 1721; see Risch & Devlin, *On the Probability of Matching DNA Fingerprints* (Feb. 7, 1992) Science, at p. 717.) ▮ But the point is not whether there are more supporters than detractors, or whether (as the Attorney General and amici curiae claim) the supporters are right and the detractors are wrong. The point is that there is disagreement between two groups, each significant in both number and expertise (a "[s]ubstantial controversy," in the words of the NRC report). (NRC rep., *supra*, at p. 74.) Even Science, which purportedly sought balance in its coverage of this dispute by commissioning the Chakraborty-Kidd article as a rebuttal to the Lewontin-Hartl article (Roberts, *Was Science Fair to its Authors?* (Dec. 20, 1991) Science, at p. 1722), recognized that the competing articles "seem likely to reinforce the notion that the [scientific] community is indeed divided" under the *Frye* standard. (*Fight Erupts, supra*, at p. 1723.)

Our task under *Kelly-Frye* is not to choose sides in this dispute over the reliability of the statistical calculation process. Once we discern a lack of general scientific acceptance—which in this instance is palpable—we have no choice but to exclude the "bottom line" expression of statistical significance in its current form.

We do not write on an entirely clean slate. The admissibility of DNA analysis evidence has been litigated in many forums in the past few years.

The statistical calculation dispute, however, has not been judicially examined until quite recently.

The few published decisions exploring the question of general acceptance on this point are in conflict. One court, applying the *Frye* standard, concluded there is currently no general acceptance as to the statistical calculation process, and thus DNA analysis evidence is inadmissible. (*Com.* v. *Curnin* (1991) 409 Mass. 218, 221-227 [565 N.E.2d 440, 442-445]; see also *Caldwell* v. *State* (1990) 260 Ga. 278 [393 S.E.2d 436, 444] [laboratory's statistical evidence inadmissible because state failed to show data bases were in Hardy-Weinberg equilibrium]; *State* v. *Schwartz* (Minn. 1989) 447 N.W.2d 422, 428-429 [exclusion of statistical probability evidence necessary because of potentially exaggerated impact on jury].) Another court concluded otherwise under an amplified *Frye* standard, adopting a magistrate's finding that it is "more likely than not" there is general acceptance as to statistical calculation, although the magistrate acknowledged that "[s]cientists of indisputable national and international repute and stature . . . took diametrically opposed views on the issue of general acceptability, and those views reflected the division of opinion on the merits of the underlying scientific disagreements." (*U.S.* v. *Yee, supra,* 134 F.R.D. at p. 206; see also *U.S.* v. *Jakobetz, supra,* 955 F.2d at pp. 791-800 [upholding finding of reliability under relaxed admissibility standard less stringent than *Frye*]; *Prater* v. *State* (1991) 307 Ark. 180 [820 S.W.2d 429, 439] [upholding admission under non-*Frye* standard based on trial evidence, but noting that statistical calculation "is not a closed issue"].)[4]

The appellate court in *Axell* found general acceptance as to statistical calculation based on testimony by Kenneth K. Kidd (one of the co-authors of the Chakraborty-Kidd article in Science) and another geneticist. The court concluded, "the prosecution showed that the method used by Cellmark in this case to arrive at its data base and statistical probabilities was generally accepted in the scientific community." (*People* v. *Axell, supra,* 235 Cal.App.3d at p. 868.)

Whatever the merits of the prior decisions on the statistical calculation process—including *Axell*—the debate that erupted in Science in December 1991 changes the scientific landscape considerably, and demonstrates indisputably that there is no general acceptance of the current process. It has

---

[4]Other recent appellate decisions have found general acceptance as to statistical calculation without any discussion of disagreement among population geneticists. (E.g., *People* v. *Lipscomb* (1991) 215 Ill.App.3d 413 [574 N.E.2d 1345, 1357].) In addition, the parties have informed us of many recent unpublished trial court decisions that have reached conflicting conclusions as to general acceptance of the statistical calculation process.

become irrelevant how *Axell* addressed this issue at the time of the decision's filing in October 1991. The situation is somewhat analogous to a "change in the attitude of the scientific community" which undermines a previously correct judicial determination of general acceptance. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) Simply put, *Axell* has been eclipsed on this point by subsequent scientific developments. In reaching a conclusion different from that in *Axell,* we do not express disagreement with *Axell*'s reasoning at the time, but rather have progressed to a point on the continuum of scientific debate which neither the *Axell* court nor the two trial courts in the present cases could have anticipated.

### 5. *The effect of no general acceptance*

The Lewontin-Hartl article in Science concludes with a famous query: "What Is To Be Done?" (Lewontin & Hartl, *supra,* at p. 1749; see Lenin, What Is To Be Done? (1902).) We confront the same question. More specifically, must the absence of general scientific acceptance as to the current statistical calculation aspect of DNA analysis result in total exclusion of DNA evidence?

DNA analysis is a powerful forensic tool by any standard, and a role for it in the process of criminal justice is inevitable. Even Lewontin and Hartl concede its potential: "Appropriately carried out and correctly interpreted, DNA typing is possibly the most powerful innovation in forensics since the development of fingerprinting in the last part of the 19th century." (Lewontin & Hartl, *supra,* at p. 1746.)

Clearly, a match of DNA patterns is a matter of substantial significance. (See NRC rep., *supra,* at p. 74 ["a match between two DNA patterns can be considered strong evidence that the two samples came from the same source."].) The statistical dispute is restricted to the *extent* of that significance. There must be some common ground, some sufficiently conservative method of determining statistical significance, as to which there is general scientific agreement. (See *Caldwell* v. *State, supra,* 260 Ga. 278 [393 S.E.2d at pp. 443-444] [laboratory's calculation of 1 in 24 million held inadmissible, but expert witness's "more conservative" calculation of 1 in 250,000 held admissible].)

The NRC report on DNA analysis appears to point the way to such common ground. The report proposes a method of statistical calculation which accounts for the possibility of population substructuring, eliminates ethnicity as a factor in the calculation process, and permits the use of the product rule while ensuring that probability estimates are appropriately

conservative. The report proposes a "ceiling frequency" approach, in which DNA samples from 15 to 20 homogeneous populations will be analyzed for allele frequencies. In subsequent analysis of the DNA of a suspect or crime scene sample, each allele will be assigned the highest frequency that appears in the tested populations, or 5 percent, whichever is greater. These frequencies will then be multiplied together using the product rule. (NRC rep., *supra*, at pp. 12-13, 82-83, 95, 134.)

Until the ceiling approach is in place, the report proposes that the following interim methods should be used to report frequencies. (1) Using a "counting principle" approach, the frequency of a DNA pattern (e.g., zero) in an existing data base should be reported. (2) Using a modified ceiling approach, each allele should be assigned a frequency of either the 95 percent "upper confidence limit" for its frequency in existing data bases (wherein the true frequency has only a 5 percent chance of variance), or 10 percent, whichever is larger, and a statistical calculation should then be made using the product rule. (NRC rep., *supra*, at pp. 14-15, 91-92, 95; see also p. 76.)

These proposals, however, do not solve the problem in the present cases. The DNA evidence admitted in *Howard* and *Barney* included frequency estimates based on statistical calculations which have not received general scientific acceptance. Even though the trial courts in these cases could not have anticipated the controversy that subsequently arose in the scientific community, this was still error, and no amount of after-the-fact fine tuning of the statistical calculation process can cure the error. The error infects the underlying match evidence, which is incomplete without an interpretation of its significance. (See NRC rep., *supra*, at p. 74.) Thus, we have no alternative but to hold that the DNA analysis evidence was inadmissible under *Kelly-Frye*, for want of general scientific acceptance of the statistical calculation process employed in these cases.

The question now at hand is whether the interim and future methods of statistical calculation proposed by the NRC report will be generally accepted by population geneticists. If, as appears likely, this question is answered in the affirmative in a future *Kelly-Frye* hearing, then DNA analysis evidence will be admissible in California.

### D.   *Use of Correct Scientific Procedures*

The last DNA issue is whether the trial courts in *Howard* and *Barney* erred by failing to receive evidence and determine, as part of the *Kelly-Frye* inquiry, whether correct scientific procedures were used when the DNA analysis was performed in each particular case.

■ The California Supreme Court held in *Kelly* that, in addition to establishing the reliability (i.e., general acceptance) of a new scientific technique and the qualifications of expert witnesses, "the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30.) This latter point is sometimes called the "third prong" of *Kelly-Frye.*

*Kelly* was straightforward in prescribing the "correct scientific procedures" inquiry. More recently, in *People* v. *Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940], the Supreme Court said, "Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony." The Supreme Court repeated this assertion in *People* v. *Cooper* (1991) 53 Cal.3d 771, 814 [281 Cal.Rptr. 90, 809 P.2d 865]. The parties disagree as to the import of this language.

The court in *People* v. *Axell, supra,* 235 Cal.App.3d at page 862, concluded that in *Farmer* the Supreme Court "did not intend to overrule the long-established 'third prong' of *Kelly* that requires proof that correct scientific procedures were used in the particular case. [Citation.]" The *Axell* court distinguished *Farmer* on the ground that the defendant in that case had not challenged the admissibility of a new scientific procedure, but merely the manner in which a procedure had been carried out. (*Axell, supra,* at p. 862.) The court reasoned, "Due to the complexity of the DNA multisystem identification tests and the powerful impact that this evidence may have on a jury, satisfying *Frye* alone is insufficient to place this type of evidence before a jury without a preliminary critical examination of the actual testing procedures performed. [Citations.]" (*Axell, supra,* at p. 862.) The court concluded, "we adhere to the traditional view that the third prong of the *Kelly* test is also the subject of a pretrial hearing on the question of admissibility." (*Axell, supra,* at p. 862.)

We agree with the *Axell* court that the Supreme Court in *People* v. *Farmer, supra,* 47 Cal.3d 888, and *People* v. *Cooper, supra,* 53 Cal.3d 771, did not intend to overrule the third prong of *Kelly-Frye.* Indeed, in the post-*Farmer* case of *People* v. *Kaurish* (1990) 52 Cal.3d 648, 688 [276 Cal.Rptr. 788, 802 P.2d 278], Justice Mosk, author of *Farmer,* in a unanimous opinion for the court specifically listed "the use of proper scientific procedures in the particular case" as an inquiry to be made at a *Kelly-Frye* hearing. (*Id.,* at p. 688.) Further, any question created by *Farmer* and *Cooper,* and any doubt as to the correctness of *Axell*'s conclusion, is dispelled by two post-*Axell* decisions in which the Supreme Court reiterated the third prong of *Kelly-Frye* as an element of the *admissibility* inquiry.

In *People* v. *Fierro* (1991) 1 Cal.4th 173 [3 Cal.Rptr.2d 426, 821 P.2d 1302] (petn. for cert. pending), the defendant challenged the admission of electrophoretic analysis of dried bloodstains. The Supreme Court held that general scientific acceptance had already been established by precedent, but also made specific reference to the "third prong" of *Kelly-Frye*, which the court described as "the application of correct scientific procedures in the case under review. [Citations.]" (*Fierro, supra*, at pp. 214-215.) The court held the defendant had waived any objection as to the third prong by stipulating that appropriate scientific procedures had been used, but, "[i]n any event, defendant has not demonstrated any deficiency in the testing procedures, or any act or omission which might have affected the reliability of the results in this case." (*Id.*, at p. 215.)

In *People* v. *Ashmus* (1991) 54 Cal.3d 932 [2 Cal.Rptr.2d 112, 820 P.2d 214] (petn. for cert. pending), the Supreme Court said "admissibility" requires "testimony as to the use of 'correct scientific procedures . . . in the particular case.' [Citation.]" (*Id.*, at p. 970, quoting *People* v. *Kelly, supra*, 17 Cal.3d at p. 30.) The court held there had been sufficient expert testimony to prove the use of correct scientific procedures in that case. (*Ashmus, supra*, at p. 972.)

These pronouncements in *Fierro* and *Ashmus* demonstrate that the third prong of *Kelly-Frye* is alive and well, and is not merely a question of weight but is an element of the *Kelly-Frye* admissibility determination.

Once general acceptance is established by a published appellate decision, it becomes a matter of precedent. (See *People* v. *Kelly, supra*, 17 Cal.3d at p. 32.) The People contend this doctrine should extend to and subsume the third prong of *Kelly-Frye*, so that in subsequent cases a showing that correct scientific procedures were used in the particular case should no longer be a prerequisite to admissibility. This notion, however, does not appear in any published decisions, and is contrary to the mode of analysis employed in *People* v. *Fierro, supra*, 1 Cal.4th at pages 214-215. Prior to the decision in *Fierro*, the California Supreme Court had already held that the new scientific technique at issue in *Fierro* had achieved general acceptance. Nevertheless, in *Fierro* the court addressed the defendant's third-prong claims. Had the prior finding of general acceptance subsumed the third prong, as the People would have it, then it would have been entirely unnecessary for the *Fierro* opinion to do so.

Moreover, the survival of the third-prong inquiry is a matter of simple common sense. If it is not established that correct scientific procedures were used in the particular case, it cannot be known whether the test actually conducted was the one that has achieved general scientific acceptance.

We note, however, that although third-prong hearings will survive a showing of general acceptance, they obviously will not approach the level of complexity of a full-blown *Kelly-Frye* hearing in which the question of general acceptance is litigated. All that is necessary in the limited third-prong hearing is a foundational showing that correct scientific procedures were used.[5]

The trial courts in *Howard* and *Barney* declined to conduct a third-prong inquiry into the question whether correct scientific procedures were used in the particular case. In light of *Fierro* and *Ashmus*, this was error.

### E. *The Question of Prejudice*

We conclude the admission of the DNA analysis evidence in the present cases was error for two reasons: (1) the absence of general scientific acceptance as to the statistical calculation process, and (2) lack of the third-prong inquiry. The remaining question is whether the errors were prejudicial or harmless. We find in both *Howard* and *Barney* that it is not reasonably probable a different result would have been reached absent the admission of the DNA evidence. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 1. *People* v. *Howard*

The significance of the DNA analysis evidence in *Howard* was not just that it placed the defendant at the crime scene. He admitted in his own trial testimony that he had been at the victim's home. More importantly, it indicated Howard had *left bloodstains from his cut finger* at the scene, supporting the inference that he had been involved in a violent encounter there.

This inference, however, did not depend solely on the DNA evidence. It was amply supported by three other aspects of the prosecutor's case.

First, Howard's wallet was found under some newspaper on a *blood-stained couch* in the victim's home. This suggested the wallet was deposited

---

[5]The Minnesota Supreme Court reached a similar conclusion in *State* v. *Jobe* (Minn. 1992) 486 N.W.2d 407. The court had ruled in a prior case that "the principles underlying forensic DNA RFLP testing" met the *Frye* test, but concluded in *Jobe* that subsequent (though lesser) *Frye* hearings would still be required "to determine whether the specific DNA results offered for admission as evidence were developed in compliance with appropriate standards and controls." (*Id.*, at p. 419.) "While we believe, given the evolving nature of this forensic specialty, a *Frye* hearing is still required, that hearing should focus only on whether the laboratory which did the testing was in compliance with the appropriate standards and controls. It should not be a forum for challenging the basic DNA RFLP testing procedures themselves." (*Id.*, at p. 420, fn. omitted.)

during the course of a bloody altercation, not innocently while Howard was looking for a receipt.

Second, Howard's fingerprint was found on a postcard located in an upstairs bedroom. Howard had no satisfactory explanation for this; he merely claimed he had never been in the bedroom, had not gone through the victim's personal belongings, and could not say whether he had touched the postcard. The fingerprint evidence supported the prosecutor's theory that Howard had gone through the victim's belongings after assaulting her, looking for money, and was being untruthful in his testimony.

Third, the DNA analysis was not the only evidence linking Howard to bloodstains in the victim's home. Conventional blood group analysis indicated that Howard's blood and the bloodstains located on the tile floor, the paper napkin found in the cosmetics case, and the tissue found in the purse, shared an unusual blood type found in only 1.2 persons out of 1,000 in the Black population. This expression of statistical significance may not have been as overwhelming as the 1 in 200 million for the DNA evidence, but it was still quite persuasive.[6]

These factors constituted compelling circumstantial evidence of guilt, rendering admission of the DNA evidence superfluous and therefore harmless.

### 2. *People* v. *Barney*

The case against Barney without the DNA evidence was compelling. Barney left his wallet in the victim's car. She identified him at a lineup, at the preliminary examination, and at trial. She identified two knives, one of which was the knife seized from Barney's home. The seized BART ticket, as well as the small change found in Barney's possession and on his front porch, tied Barney to the offenses. Moreover, in rendering its verdict the trial court expressly stated "that in the final analysis, the same verdicts would have been reached without any DNA evidence. . . . [T]he recovery of the wallet and the BART ticket coupled with the identification of Mr. Barney by [the victim] were the most weighty items of evidence in the case." Thus, as in *Howard*, the admission of the DNA evidence was superfluous and therefore harmless.

---

[6]We recognize the irony in finding a frequency estimate of 1.2 in 1,000 to be significant while excluding DNA evidence which would have to be in error by *five or six orders of magnitude*—a degree of error not even claimed by Lewontin and Hartl—to approach a reduced equivalence. This does not, however, undermine our finding of no general acceptance, but rather underscores the need to find a low threshold of agreed statistical significance for DNA evidence.

## V. NON-DNA ISSUES*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI. DISPOSITION

The judgments are affirmed.

Merrill, Acting P. J., and Werdegar, J., concurred.

The petitions of both respondent and appellant for review by the Supreme Court were denied November 25, 1992. Panelli, J., was of the opinion that the petitions should be granted.

---

*Part V of this opinion is not certified for publication. (See fn., *ante*, at p. 798.)