Stephen J. HARMON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5139.

Court of Appeals of Alaska.

Dec. 22, 1995.

 

Robert S. Noreen, Fairbanks, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

COATS, Judge.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

Either late in the evening of May 15 or early May 16, 1992, B.K. was sexually assaulted and murdered. The state charged Stephen J. Harmon with sexual assault in the first degree and murder in the first degree after the results of DNA testing connected him with the crime. Following a trial, a jury convicted Harmon of the sexual assault and murder. Superior Court Judge Niesje J. Steinkruger sentenced Harmon to maximum consecutive sentences of thirty years for the sexual assault and ninety-nine years for the murder. Judge Steinkruger also ordered that Harmon would not be eligible for parole for ninety-nine years. Harmon appeals his conviction and sentence. We affirm.

II. *ANALYSIS*

A. *SPEEDY TRIAL*

Harmon first contends that Judge Steinkruger erred in refusing to dismiss the charges against him under Alaska Criminal Rule 45, the speedy trial rule. In 1992, Criminal Rule 45 provided that the state was required to try a defendant within 120 days, less certain excluded periods, from either the date the defendant was arrested or initially arraigned, or the date the charge (complaint, indictment, or information) was served on the defendant, whichever event occurred first. Harmon argues that the speedy trial period began on June 12, 1992, when he was taken into custody by federal authorities for a federal firearms violation. The state argues that the speedy trial rule did not start until

September 8, 1992, when Harmon was arraigned on the indictment for sexual assault and murder.

The parties generally agree on the factual background of this issue. On June 5, 1992, Alaska State Troopers executed a search warrant on Harmon's residence to look for evidence which would connect Harmon with B.K.'s murder. During the search, the troopers found and seized a rifle. Following the search, the troopers notified federal authorities of Harmon's possession of the firearm. Harmon had prior felony convictions. On June 12, 1992, FBI Agent James Kelley served Harmon with a federal arrest warrant for being a felon in possession of a firearm. Harmon remained in federal custody until he was arraigned on the state indictment for sexual assault and murder. The federal authorities dismissed the federal firearms charges shortly after the state indicted Harmon.

Harmon claims that the state troopers acted in collusion with federal authorities to hold him in custody on the federal firearms charge until the state could indict him for sexual assault and murder. According to Harmon, the facts of his case should have prompted the trial court to hold the state responsible for detaining him on the sexual assault and murder charges on June 12, 1992, when the federal authorities arrested him.

In *Demientieff v. State*, 814 P.2d 745 (Alaska App.1991), we rejected an argument similar to the one Harmon proposes. Demientieff was the prime suspect in a murder case. During the investigation of the murder case, state troopers learned that Demientieff, who was on probation, had possessed a handgun and had been drinking on the night of the murder. The troopers informed Demientieff's probation officer that Demientieff had consumed alcohol and possessed a firearm in violation of his probation. The probation officer then arrested Demientieff. Demientieff was in jail for the probation violation when the state formally charged him with the murder. Demientieff argued that the 120-day speedy trial period for the murder charge commenced when his probation officer arrested him for violating the conditions of his probation. We affirmed the trial

court's ruling that Criminal Rule 45 did not begin until Demientieff was arraigned on the murder charge. We concluded:

> Since Demientieff, when arrested for violating the conditions of his probation, was not held to answer for the murder ... or even for criminal charges relating to his consumption of alcohol or possession of a concealable firearm, the Rule 45 speedy trial period did not begin to run [when Demientieff was arrested for the probation violations]. Rather it began to run ... when Demientieff was arraigned on the murder charge.

*Demientieff,* 814 P.2d at 747.

Similarly, Harmon was arrested by federal authorities on federal charges. He was not arrested on the sexual assault and murder charges. Therefore, Criminal Rule 45 did not begin to run until Harmon was arraigned on the indictment. Harmon concedes that if Criminal Rule 45 began at his arraignment, he was tried within the 120-day period mandated by Criminal Rule 45. We accordingly conclude that Judge Steinkruger did not err in rejecting Harmon's Rule 45 claim.

### B. INDICTMENT

■ Harmon argues that the indictment against him should have been dismissed because the state improperly introduced DNA evidence during the grand jury proceedings and implied that DNA evidence was routinely admissible in Alaska. The state points out that Harmon never raised this claim in the trial court. Because Harmon did not raise this argument prior to trial, he has waived it. Alaska R.Crim.P. 12(e); *Gaona v. State,* 630 P.2d 534, 537 (Alaska App.1981).

### C. PRIOR CRIMES

■ Harmon also claims that Judge Steinkruger erred in allowing the state to introduce at trial evidence of his two prior convictions for sexual assault and the circumstances surrounding those convictions. Harmon was convicted of two sexual assaults in the State of Arizona in 1980. The Arizona court sentenced him to ten years of incarceration on these convictions. The prosecution in the present case contended that

the circumstances of Harmon's prior sexual assault convictions were sufficiently similar to the facts of the present case to be relevant to establish Harmon's identity as the person who murdered B.K. Following extensive argument by the parties, Judge Steinkruger concluded that the circumstances of the prior convictions were relevant as identification evidence. Harmon, however, argues that evidence of his prior convictions for sexual assault was inadmissible under Alaska Evidence Rules 404(b) and 403.[1]

We conclude that Judge Steinkruger could properly determine that evidence of the prior crimes was admissible to show that Harmon murdered B.K. by a distinctive *modus operandi* which he had employed in the prior sexual assaults.[2] This *modus operandi* was extremely similar to the *modus operandi* that the killer of B.K. used. *Coleman v. State*, 621 P.2d 869 (Alaska 1980), discusses when the state may introduce evidence of a distinctive *modus operandi* in prior crimes to prove a defendant's identity as the perpetrator of a crime. In *Coleman*, the court stated:

> [T]he evidence in question showed that the prior rape and the rape of B.E. were sufficiently similar and unusual in their common pattern to constitute a *modus operandi* probative of Coleman being the assailant in both instances. The testimony showed the two crimes shared common elements in the race and age of the victims, the situs chosen for the attack, the manner of subduing the victim, the type of intercourse which occurred, and behavior of the assailant following the attack. Both

victims were relatively young caucasian women, and were on foot near a wooded area when attacked. Each indicated that the first awareness of the assailant's presence was the sound of running footsteps behind her, and that the first realization that she was being assaulted was when the attacker placed his arm around her throat, choking her. In both instances, the attacker rapidly propelled the victim from behind, with his arm still around her throat, into the woods. In both instances oral intercourse was performed as well as an effort at vaginal intercourse (the prior rape also involved anal intercourse). Following both attacks the assailant discussed whether the victim would report him to the police, and allowed the victim to walk away. These characteristics are not so unique as to constitute a "signature crime," as one commentator suggests should be required to prove like identity, nor is each of the above common features material standing alone. But a review of cases in this and other jurisdictions indicate that the similarities in the attacks, taken together, compare favorably with other instances where evidence of prior rapes has been held properly admitted for the purpose of proving identity.

*Coleman*, 621 P.2d at 875 (footnotes omitted).

In deciding that Harmon's prior crimes were admissible, Judge Steinkruger carefully analyzed *Coleman* and the present case. She pointed out the remarkable similarities between the facts of Harmon's prior sexual assaults and the circumstances surrounding the murder of B.K. Like the victims of

---

1. Rule 404(b) provides:
   (1) Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
   Rule 403 provides:
   Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

2. In *Coleman v. State*, 621 P.2d 869, 874 n. 4 (Alaska 1980), the court, quoting *People v. Sam*, 71 Cal.2d 194, 77 Cal.Rptr. 804, 809, 454 P.2d 700, 705 (1969), explained *modus operandi* as follows:

   > *Modus operandi* is generally a means of proving the identity of the perpetrator of the crime charged, by demonstrating that the defendant had committed in the past other crimes sharing with the present offense features sufficiently unique to make it likely that the same person committed these several crimes.

Harmon's prior sexual assaults, B.K. was a white single female who had previously met Harmon in a social setting and subsequently rejected his offers of a romantic relationship. Harmon's prior victims had let him into their homes where he assaulted them in their rooms shortly after midnight. Similarly, evidence showed that B.K. let her assailant into her home where she was murdered in her living room about midnight. Harmon had been drinking on the nights of his prior assaults, and, on the night B.K. was murdered, evidence showed that Harmon had been drinking to the point that his speech was slurred.

In addition, Judge Steinkruger found that there were similarities in the nature and manner of the attacks. For instance, Harmon's two prior convictions were for sexual assault. Evidence established that B.K. had been sexually assaulted by her assailant. Harmon had also physically assaulted his two prior victims, and evidence showed that B.K. had been beaten. Harmon had used a knife in his prior assaults; evidence showed that B.K.'s assailant had cut her with a knife. Furthermore, Harmon had used an electrical cord to tie the hands of his victims in the prior sexual assaults. B.K.'s assailant cut an electrical cord from her sewing machine and apparently wrapped the cord around her neck.

We believe that the similarities between Harmon's prior sexual assaults and the murder of B.K. are, if anything, more distinctive than the evidence which the supreme court concluded was sufficiently similar to permit introduction of the prior crimes evidence in *Coleman.* Accordingly, we conclude that Judge Steinkruger did not err in admitting this evidence.

■ One further point which Harmon raises on this issue deserves comment. Harmon points out that over twelve years passed between the events that led to his previous convictions and the murder of B.K. He contends that these prior convictions were therefore too remote to be sufficiently probative for admission against him. In analyzing this contention, Judge Steinkruger pointed out that Harmon had been incarcerated for eight years, and therefore, for most of the period

of time since his prior convictions, had not had an opportunity to commit a similar offense. She concluded that under these circumstances, given the strength of the evidence that Harmon had committed the prior assaults (which were proven by convictions), and the similarity of the two prior assaults and the circumstances of B.K.'s murder, the evidence was not too remote in time to be admissible. We conclude that Judge Steinkruger's analysis is sound. *See United States v. Hadley,* 918 F.2d 848 (9th Cir.1990); *Coleman,* 621 P.2d at 875–76 n. 8; *State v. Breazeale,* 238 Kan. 714, 714 P.2d 1356, 1363 (1986).

### D. *DNA TESTING*

■ Harmon next contends that the trial court erred in admitting results of deoxyribonucleic acid (DNA) testing as evidence against him at trial. At issue are two kinds of DNA testing: restriction fragment length polymorphism typing (RFLP) and polymerase chain reaction typing (PCR). The state introduced the results of RFLP testing on anal swabs taken from B.K. and on a semen stain from her underpants. The state also introduced the results of PCR testing on two hairs that were found on and near the victim, the semen sample from her underwear, bloodstains on the electrical cord found at the scene, and bloodstains on Harmon's watch. In all of the DNA testing, the scientists compared the DNA recovered from the crime scene with DNA from known specimens from the victim and from Harmon. Blood samples from two other suspects were analyzed and eliminated as sources of the DNA samples found at the scene. The results of both the RFLP and the PCR testing were highly incriminating of Harmon.

Prior to trial, Harmon filed a motion to suppress the test results. He contended that DNA testing had not achieved sufficient acceptance in the relevant scientific community to be admissible. Judge Steinkruger held an extensive hearing before trial to determine the admissibility of the DNA evidence. At the hearing, the prosecution and defense presented several witnesses who testified about the general scientific acceptance of the DNA testing and the procedures which were fol-

lowed in analyzing the DNA evidence in this case.[3] In addition, the trial court considered several scientific articles on DNA testing. Following the hearing, in extensive written findings, Judge Steinkruger concluded that both RFLP and PCR were generally accepted in the scientific community and that the results of the DNA testing were admissible in this case.[4]

### 1. *Frye Test*

As Judge Steinkruger recognized, the admission of novel scientific evidence is governed in this state by the *Frye* test.[5] In *Frye*, the court commented:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

293 F. at 1014. The Alaska Supreme Court, in *Contreras v. State*, 718 P.2d 129, 135 (Alaska 1986), outlined the manner in which trial courts may permit the admission of novel scientific evidence:

> Applying *Frye* is a two-step process: first, the relevant scientific community must be defined, and second, the testimony and publications of the relevant experts in the field must be evaluated to determine if there is general consensus that [the scientific analysis] is reliable.

This is the test that the trial court applied.

### 2. *Testing Techniques and Procedures*

Harmon contends that in order to admit the DNA evidence, the trial court was required, in addition to the *Frye* test, to show that the laboratories that analyzed the DNA evidence used accepted scientific techniques in analyzing the forensic samples. Harmon relies on *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.1989). As Harmon points out, in *Mattox v. State, Dept. of Revenue*, 875 P.2d 763, 765 (Alaska 1994), the supreme court stated: "In DNA tests, as in other scientific tests, assuming general scientific acceptance, set procedures must be followed to insure the validity of the tests.

---

**3.** Testifying for the state were: Leanne Strickland, a forensic serologist from the Alaska State Crime Laboratory; Dr. Jenifer Lindsey, a forensic serologist from the FBI; Dr. Cecelia von Beroldingen, a molecular biologist at the Oregon State Police Forensics Laboratory; Joe Urbanovsky, the forensic supervisor of the Texas Department of Safety Crime Laboratory; and Dr. Randjit Chakraborty, a professor of human population genetics at the University of Texas Health Science Center in Houston.

Testifying for the defense were: Robert Thompson, a forensic supervisor with the Genelex Corporation in Seattle; John Murdock, who recently retired as Chief of the Sheriff's Department, Criminalistics Laboratory in Contra Costa County, California; and Brian Wraxall, a forensic serologist from California.

**4.** Judge Steinkruger's findings are attached as Appendices A and B.

**5.** *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). The Alaska Supreme Court adopted the *Frye* test in *Pulakis v. State*, 476 P.2d 474 (Alaska 1970).

The state questions whether the *Frye* test is still viable in Alaska. The state points out that in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court unanimously held that the *Frye* test, the generally accepted standard for the admission of expert scientific testimony, was no longer the test that federal courts would apply. The Supreme Court held that *Frye* had been superseded by Federal Evidence Rule 702, which provides a more liberal standard for admitting relevant expert evidence. *Id.* —— U.S. at ——–——, 113 S.Ct. at 2793–94. Alaska Evidence Rule 702 was derived from, and is identical to, Federal Rule of Evidence 702.

In *Contreras v. State*, 718 P.2d 129 (Alaska 1986), the Alaska Supreme Court affirmed its adherence to the *Frye* standard, despite the state's argument in that case that the *Frye* test was superseded by the enactment of the Federal Rules of Evidence. *Contreras*, 718 P.2d at 136. Of course, it is entirely possible that the supreme court would reevaluate its position in light of the United States Supreme Court's decision in *Daubert*. However, we believe that given the supreme court's adherence to the *Frye* standard in *Contreras*, the proper course of action is for us to follow the existing standard. *See Mattox v. State, Dept. of Revenue*, 875 P.2d 763 (Alaska 1994) (applying *Frye* but noting *Daubert* ).

Compliance with these procedures must be shown."

In Harmon's case, the state presented extensive testimony concerning the procedures that were followed in conducting the DNA tests. The state also presented extensive testimony that these procedures were valid and had general scientific acceptance. Although Judge Steinkruger rejected the analysis in *People v. Castro,* she concluded in her findings that the laboratories that tested the DNA evidence in Harmon's case followed standard, generally accepted procedures. This finding is supported by the record and makes it unnecessary for us to decide whether *Castro* applies to this case.

The following background information about DNA is from *State v. Cauthron,* 120 Wash.2d 879, 846 P.2d 502, 508 (1993) (footnote omitted):

DNA (deoxyribonucleic acid) is the chemical material contained within an organism's cells which determine that organism's physical composition. Human cells each contain 46 chromosomes, which are arranged in 23 pairs. One chromosome in each pair is inherited from each parent. Approximately 100,000 genes are located on the chromosomes. Genes, which consist of DNA, determine eye, hair, and skin color, the organization of body parts, and virtually everything else about our physical state. Each individual, with the exception of identical twins, has a unique DNA structure which is contained in every nucleated cell. That structure remains constant throughout a human lifetime. It can be found in blood, semen, hair, bone marrow, and other tissues.

DNA typing is a process by which genetic variation between individuals is recognized and catalogued. In criminal investigations, DNA is extracted from human fluid and tissue samples recovered from a crime scene. In RFLP typing, the extracted DNA is enzymatically cut into fragments, which are separated according to their size. Once they have been separated, the fragments are radioactively marked and an x-ray photograph of the DNA is taken. The DNA of suspects is similarly processed and photographed. The image derived from each suspect's DNA is then compared to the photograph based on the genetic evidence obtained from the crime scene to determine whether they match. RFLP typing is used for larger (dime-size) blood and semen stains. For smaller, older, and weathered evidence, PCR may be used.

In PCR typing, a specific region of the genetic material recovered from the crime scene is copied using enzymes. The copying continues over several repetitions so that the number of specific DNA segments increases exponentially. The amplified DNA, copied millions of times, is then tested against known genetic sequences to determine its character. Once the character of the DNA recovered from the crime scene is ascertained, it can be compared to the genetic makeup of the suspects. PCR testing is less precise than RFLP, and the PCR DNA is more easily contaminated. National Research Council, *DNA Technology in Forensic Science* 36–44 (1992); U.S. Congress, Office of Technology Assessment, *Genetic Witness: Forensic Uses of DNA Tests* 43–50 (1990).

There seems to be little question concerning the scientific acceptance of the theory underlying both RFLP and PCR DNA typing. *See, e.g., Commonwealth v. Curnin,* 409 Mass. 218, 565 N.E.2d 440, 441 (1991); *State v. Schwartz,* 447 N.W.2d 422, 426 (Minn. 1989); *State v. Woodall,* 385 S.E.2d 253, 260 (W.Va.1989). *See also* William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va.L.Rev. 45, 60 (1989).

■ Judge Steinkruger found that the techniques and procedures relied upon to test the evidence in this case were generally accepted in the scientific community as capable of producing reliable results. She found that the tests performed in this case are "routinely performed and are generally accepted in the relevant scientific community of molecular biologists, DNA forensic scientists, biochemists and population geneticists." She found that the witnesses who testified "explained the controls that were used to insure reliable results generally and in these tests specifically." She also found that "recent cross validation studies between RFLP and PCR provide the most recent evidence of

[DNA testing's] scientific reliability for forensic purposes." Judge Steinkruger's findings are fully supported by the record.

### 3. Statistical Analysis

Theoretically, each person's DNA is unique; that is, with the exception of "identical twins," no two persons share exactly the same complement of genes.[6] At the same time, however, it is rare for a specific gene to be unique to a single individual. Some genes—for instance, the genes that direct our bodies to form two arms and two legs— are found in virtually every human being. Other genes, such as those that determine skin, hair, and eye color, are shared by substantial numbers of people. Still other genes are so rare that they are shared by only small percentages of the general population. Tests for these rare genes are used in paternity cases. *See Smith v. Smith,* 845 P.2d 1090 (Alaska 1993).

That genes are shared by groups of people is of crucial significance when DNA testing is employed to identify the perpetrator of a crime. Even though DNA testing can accurately identify a person's genes, the fact that a person carries a particular gene means little unless scientists can also tell us the likelihood that other people share that same gene. The fact that a defendant carries the same gene as was found in a tissue sample taken at the scene of the crime is not particularly probative if a high percentage of the population also carry that same gene; conversely, if the gene is quite rare, then the DNA match becomes correspondingly more probative.

Harmon's main attack on the admissibility of DNA evidence concerns the problem of "population substructures." A population substructure is a cohesive group of people who generally do not mate with people outside of their group (because of physical iso-lation, or because of cultural, racial, or religious factors, or a combination of these).

As explained above, the usefulness of DNA testing in criminal litigation depends on being able to identify what percentage of the population carries the particular gene whose presence was tested for. Certain critics of DNA testing have suggested that the existence of population substructures greatly complicates this problem, to the point where DNA testing has only marginal usefulness.

These critics argue that, even though scientists may be able to ascertain the frequencies of particular genes in the general population, this knowledge must be tempered by the fact that members of the general population do not mate and reproduce at random. Rather, the general population is comprised of numerous population substructures, distinct groups of people who tend to mate and reproduce within their groups. If the people in a population substructure have distinctive genes, then, because members of the group generally do not mate with outsiders, the group's distinctive genes would tend to stay within the group and not be freely shared with the general population. This fact would make it harder to calculate the probability that a particular individual carried a specific gene; probability analyses that ignored the presence of population substructures would tend to overstate the significance of a DNA match. *See* William C. Thompson, *Evaluating the Admissibility of New Genetic Identification Tests: Lessons from the "DNA War",* 84 J.Crim.L. & Criminology 22, 61–65 (1993). Harmon raises the statistical problem of population substructures to attack the admissibility of DNA evidence in general.

In the recently enacted AS 12.45.035 (*see* ch. 7 § 2 SLA 1995), the Alaska Legislature apparently declared that DNA evidence is admissible despite this potential problem.[7]

---

**6.** Genes are sections of the DNA molecule governing the production of proteins which, in a broader sense, determine a person's hereditary character. Alleles are the various forms or varieties of a particular gene. Technically speaking, it is the frequency with which alleles occur in a given population that is at issue in this case. We refer to genes for the sake of simplicity, however.

**7.** Under AS 12.45.035(a), "evidence of a DNA profile is admissible to prove or disprove any relevant fact, if the court finds that the technique underlying the evidence is scientifically valid. The admission of the DNA profile does not require a finding of general acceptance in the relevant scientific community of DNA profile evidence."

Harmon's case was tried before the effective date of AS 12.45.035, however; the *Frye* test therefore governed Judge Steinkruger's decision regarding this aspect of the admissibility of the DNA evidence at Harmon's trial.[8] Judge Steinkruger found that the statistical analysis of the DNA test results satisfied the *Frye* test and was therefore admissible. Having reviewed the record, we agree.

Judge Steinkruger recognized that a statistical analysis which understated the probability of a match between Harmon's DNA and the DNA found at the crime scene (thereby overstating the significance of the match) could be unduly prejudicial. The trial court heard extensive testimony concerning statistical analysis of the matching results. Basically, the testimony showed that the methods that were used to determine the probability of a match incorporated conservative assumptions that, if anything, were designed to overstate the probability of a match. Dr. Jenifer Lindsey, a forensic serologist at the FBI, testified that she calculated and reported the results using a conservative method recommended by the National Research Council. She felt that the method employed accounted for population substructures. Dr. Randjit Chakraborty, a prominent expert in human population genetics, reviewed Dr. Lindsey's findings and approved of the method employed by the FBI. He found the statistical results reported by Dr. Lindsey conservative, accurate, and reliable.

Judge Steinkruger concluded, after hearing the evidence, that the statistical analysis was sufficiently conservative to be admissible. We agree that the extensive testimony presented in this case established that the statistical analysis allowed for the possibility of population substructures and conservatively estimated the probability of a match.

Under *Frye* and *Contreras*, we must first determine the relevant scientific community and then decide whether statistical analysis used in this case is generally accepted within that community. We find the relevant scientific community to be human population geneticists and agree with the trial court that the population statistical analyses of the PCR typing and the RFLP matching are generally accepted within the scientific community. We conclude that there was no error in admitting the evidence of DNA typing and the statistical interpretation of this evidence.

### 4. *Consumption of Evidence*

■ Harmon also contended in his motion to suppress that, in the process of testing the DNA taken from the crime scene, the state consumed the evidence of the blood stains on his watch and on the electrical cord, anal swabs from the victim, and hairs from the victim's underpants. Harmon argues that the state violated his right to due process of law by failing to give him the opportunity to have a defense expert observe the state's testing process and by destroying the evidence so that he was unable to conduct independent testing.

In ruling against Harmon's motion, Judge Steinkruger pointed out that the state tested the evidence during the investigative stage of the case before the grand jury indicted Harmon. At that time, the state was comparing the DNA evidence found at the crime scene not only with samples obtained from Harmon but also with DNA obtained from two other suspects. Judge Steinkruger found that the state experts had tested the DNA evidence using sound laboratory procedures, that they had used only as much of the evidence as was necessary for testing, and that they had preserved as much of the evidence as possible for retesting. She observed that even the leading defense expert, Robert Thompson,

---

In subsection (b)(2) of the statute, "DNA profile" evidence is defined as

(A) ... an analysis of blood, semen, tissue, or other cells bearing deoxyribonucleic acid resulting in the identification of the individual's patterned chemical structure of genetic information;

(B) [and] includes statistical population frequency comparisons of the patterned chemical structures described in (A) of this paragraph.

8. The passage of the new law presents a potential conundrum: that the DNA evidence could have been inadmissible at the time it was offered but would be admissible at any new trial. We find, however, that the evidence was properly admitted under the *Frye* test, so no problem is presented by the change in the law.

had testified that the scientists who tested the evidence for the state appeared to have consumed no more evidence than was necessary. Judge Steinkruger noted that the state had taken photographs of the hair, the watch, and the electrical cord, including microscopic photographs, prior to testing so that Harmon's experts could observe the evidence in the condition in which the police found it at the crime scene. She also determined that the state experts had sufficiently documented their actions and turned over their laboratory notes and diagrams to defense experts so that they could review the state's testing procedures.

Judge Steinkruger found that the state had made available to the defense DNA and amplified DNA from the blood stains on the severed electrical cord and Harmon's wristwatch as well as the hair found at the crime scene. The defense experts, however, made no attempt to independently retest the DNA extracts. As for the anal swabs, Judge Steinkruger found that the defense had the autorads from the RFLP procedure available for review of the RFLP typing. (Autorads were used during RFLP testing to type and compare the DNA found on the anal swabs with Harmon's DNA.) Furthermore, defense expert Thompson testified that it might have been possible to subject what remained of the anal swabs to PCR testing. With regard to the possibility of the defense conducting different tests, Judge Steinkruger found that the defense had the stained clipping from B.K.'s underpants available to conduct semen testing by any method which Harmon's experts desired. She also found that Harmon had the ability to independently examine and challenge the state's testing procedures. Judge Steinkruger concluded that the state had not violated Harmon's rights under Alaska Rule of Criminal Procedure 16 or under due process.

In ruling on Harmon's motion, Judge Steinkruger relied on *Lee v. State*, 511 P.2d 1076 (Alaska 1973). Lee was found in possession of four balloons, three of which contained white powder. The state analyzed one of the balloons and discovered that it contained heroin. The state charged Lee with possession of heroin. Lee contended that he was denied due process of law because the state consumed all of the white powder in the balloon which was tested. Lee argued he was denied the opportunity to conduct an independent test of that balloon. The supreme court rejected Lee's argument:

> In those cases where expert analysis exhausts the substance there is clearly no error in the admission of evidence regarding the analysis in the absence of the allegations and proof of deliberate destruction, or deliberate attempts to avoid discovery of evidence beneficial to the defense.

*Lee*, 511 P.2d at 1077 (footnotes omitted). In reaching this decision, the supreme court also stated:

> It is apparent that the alleged problem might have been further minimized if appellant had secured expert examination of the contents of two of the remaining balloons which still contained a residue of powder even at the time they were introduced in evidence at the trial of this case.

*Id.* at 1078.

Harmon relies on *Lauderdale v. State*, 548 P.2d 376, 382 (Alaska 1976), and *Thorne v. Department of Public Safety*, 774 P.2d 1326 (Alaska 1989), in arguing that the state failed to preserve material evidence. In *Lauderdale*, the supreme court quoted with approval language in *Lee:* "[W]here expert analysis exhausts the substance there is clearly no error in the admission of [the] evidence." *Lauderdale*, 548 P.2d at 382 (internal quotes omitted). However, in *Lauderdale*, the supreme court held that the state erred when it destroyed breathalyzer ampoules, because the ampoules might have led to exculpatory evidence. The supreme court pointed out that the state had destroyed the ampoules; they had not been used up in testing. *Id.* More recently, in *Thorne*, the court held that the state violated Thorne's right to due process by failing to preserve a videotape that the police took while Thorne was arrested for driving while intoxicated. The court held that the state was required, under the due process clause, to preserve the videotape since it might have been favorable to Thorne's defense.

We agree with Judge Steinkruger that *Lee* is controlling under the facts of this case. In *Lee*, the state consumed the heroin in one balloon during testing. *Lauderdale* and *Thorne* are distinguishable as cases where the state did not use up the evidence in testing, but negligently failed to preserve the evidence. In the present case, the testing was done during the investigative stage. The state showed that it was necessary for its experts to use up some of the evidence in order to test it. The state experts made substantial efforts to preserve evidence of their testing so that the defense experts would be able to review the state's results. Furthermore, there was still substantial evidence left over after the state tests so that the defense could perform its own tests. We conclude that Judge Steinkruger did not err in denying Harmon's motion to suppress. *See Lee*, 511 P.2d at 1078; John P. Ludington, Annotation, *Consumption or Destruction of Physical Evidence Due to Testing or Analysis by Prosecution's Expert as Warranting Suppression of Evidence or Dismissal of Case Against Accused in State Court*, 40 A.L.R.4th 594 §§ 4–5 at 607–16 (1985 & Supp.1995).

### E. SENTENCE

Harmon next raises several issues concerning his sentence. Judge Steinkruger sentenced Harmon to ninety-nine years of imprisonment for murder in the first degree and to thirty years of imprisonment for sexual assault in the first degree. Both of these sentences are maximum sentences. AS 12.55.125(a), (i). Judge Steinkruger imposed these sentences consecutively and, in addition, ruled that Harmon would be ineligible for parole for ninety-nine years. Judge Steinkruger made extensive findings in support of this sentence. She emphasized the fact that Harmon had two prior convictions for sexual assaults that were similar to the sexual assault that ended with Harmon's murder of B.K. Harmon had received a lengthy sentence for these convictions and had actually served eight years of imprisonment. Judge Steinkruger found the aggravating factor that "the conduct constituting the offense was among the most serious conduct included in the definition of the offense."

AS 12.55.155(c)(10). She also found the aggravating factor that Harmon's "conduct during the commission of the offense manifested deliberate cruelty to another person." AS 12.55.155(c)(2). She concluded from the evidence that Harmon had premeditated the offense and had used his friendship with B.K. to gain entry to her home. He then tortured B.K. by poking and cutting her with a knife and strangling her with a piece of electrical cord. Judge Steinkruger found that Harmon had not only sexually assaulted and murdered B.K., but that he had tortured her for his own sexual gratification. She concluded that Harmon was extremely dangerous to women and, based on his past history of sexual violence and his present offense, would reoffend unless he was incarcerated for the remainder of his life. She found that he had no prospects for rehabilitation and that it was necessary to restrict his parole so that he would never have the opportunity to commit a similar crime.

Harmon first contends that Judge Steinkruger erred in finding the aggravating factor that Harmon's "conduct during the commission of the offense manifested deliberate cruelty to another person." In *Juneby v. State*, 641 P.2d 823 (Alaska App.1982), we stated:

> The word "cruelty" thus denotes the infliction of pain or suffering for its own sake, or for the gratification derived therefrom. We think that, in accordance with this common definition, the term "deliberate cruelty," as used in AS 12.55.155(c)(2) must be restricted to instances in which pain—whether physical, psychological, or emotional—is inflicted gratuitously or as an end in itself. Conversely, when the infliction of pain or injury is merely a direct means to accomplish the crime charged, the test for establishing the aggravating factor of deliberate cruelty will not be met.

*Juneby*, 641 P.2d at 840 (first set of quotation marks added). Judge Steinkruger's findings clearly support the aggravating factor. She found that Harmon had tortured B.K. for his sexual gratification and had gratuitously inflicted pain upon B.K. when he had sexually assaulted and murdered her.

■ Harmon next argues that Judge Steinkruger erred in restricting his parole eligibility for ninety-nine years. In *Stern v. State*, 827 P.2d 442, 450 (Alaska App.1992) (citations omitted), we stated:

> When a sentencing judge restricts parole eligibility, the judge must specifically address the issue of parole restriction, setting out with particularity his or her reasons for concluding that the parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)–(d) is insufficient to protect the public and insure the defendant's reformation. When the defendant's sentence is lengthy ... Alaska law presumes that questions of discretionary release are better left to the Parole Board, since the Board evaluates the advisability of parole release in light of the defendant's tested response to Department of Corrections rehabilitative measures. However, because the Alaska legislature has affirmatively given sentencing judges the power to restrict or deny parole eligibility, this presumption (that parole release of long-term prisoners should normally be evaluated after the defendant has established an institutional history) must remain rebuttable.

Later in *Stern*, we noted that "a finding that the defendant cannot be rehabilitated within the prescribed parole eligibility period will justify parole restriction." *Id.* at 453. Judge Steinkruger directly addressed the parole restriction in her sentencing remarks. She concluded that Harmon's prior criminal history of sexual assault, the seriousness of his present offense, and his poor rehabilitation potential established that Harmon was an extremely dangerous offender who would reoffend if not confined for the remainder of his life. Her findings are supported by the record and justify the parole restriction in this case.

Harmon argues that his composite sentence is excessive. We believe that Judge Steinkruger's findings are supported by the record and justify the sentence that she imposed.

___
* Judge Steinkruger's Decisions and Orders have been edited for publication in conformance with Alaska Court of Appeals procedural standards.

## III. CONCLUSION

The conviction and sentence are AFFIRMED.

### APPENDIX A

THE SUPERIOR COURT FOR THE STATE OF ALASKA
FOURTH JUDICIAL DISTRICT

STATE OF ALASKA, Plaintiff,

vs.

STEPHEN J. HARMON, Defendant,

Case No. 4FA–S92–2481 CR

DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS DNA/RFLP IDENTIFICATION EVIDENCE *

The defendant has moved to suppress evidence the state intends to offer at trial that results from DNA/RFLP laboratory testing. This court held an evidentiary hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and *State v. Contreras*, 674 P.2d 792 (Alaska App.1983), *rev'd on other grounds*, 718 P.2d 129 (Alaska 1986). The court heard the testimony of Detective Lantz Dahlke, Detective Timothy Hunyor, Dr. Jenifer Lindsey, Dr. Randjit Chakraborty, Dr. Cecelia Von Beroldingen, Joe Ronald Urbanovsky, Leanne Strickland, Robert Thompson, John Murdock, and Brian Wraxall. In addition, this court has considered the numerous scientific articles, affidavits, transcripts and other exhibits submitted by the parties, as well as the case law cited and the arguments of counsel. Based upon all of the above, the court makes the following findings of fact and conclusions of law:

1. The state seeks to admit evidence at trial which results from deoxyribonucleic acid (DNA) analysis using the process called "restrictive fragment length polymorphism" analysis (RFLP). The defendant alleges that the RFLP analysis does not meet the evidentiary standards for admissibility at trial.

___
Appendices and exhibits referred to have not been included for publication.

2. In Alaska, the *Frye–Contreras* test requires that a pretrial hearing be held to determine the admissibility of new scientific evidence. *Haakanson v. State,* 760 P.2d 1030 (Alaska App.1988). The test allows new scientific evidence to be admitted if there is general acceptance in the scientific community. The application of this test is a two step process. First, the court must determine the relevant scientific community, and second, the court must consider the testimony and publications of the relevant experts in the field to determine if there is general acceptance. *Contreras v. State,* 718 P.2d 129 (Alaska 1986). The state argues that the *Frye–Contreras* analysis is no longer valid and the admissibility of such expert testimony should be evaluated pursuant to Alaska Rule of Evidence 702, adopted from the Federal Evidence Rules. Alaska has declined to replace the *Frye–Contreras* evaluation with the evidence rule regarding expert testimony and therefore this court has applied the *Frye–Contreras* analysis. *Contreras,* 718 P.2d at 136.

3. Pursuant to *Frye,* in order for scientific data to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014. This court has applied the two prong *Frye* test for the admission of scientific evidence, that is: (1) Is the scientific theory generally accepted in the scientific community; and (2) Are there techniques, experiments, and procedures that currently exist that are capable of producing reliable results which are generally accepted in the scientific community. *United States v. Downing,* 753 F.2d 1224 (3rd Cir.1985); *State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483 (1992). The defendant argues that the court should apply a *"Castro"* analysis to require a pretrial evidentiary hearing of a third prong, that is, whether correct scientific procedures were used when the DNA analysis was performed in each particular case. *People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (Sup.1989). This court holds that the third prong is not required by the *Frye* analysis of scientific evidence. Adop-

tion of this third prong would apply a new and special rule only for one kind of scientific evidence, DNA. It would require that even if the appellate courts determine that certain DNA analysis is admissible, that at the trial level, a "Third Prong Frye Hearing" would have to be held in each case, prior to trial, for the court to determine if the testing laboratory performed according to accepted scientific techniques in analyzing the forensic samples in each particular case. This court finds that the issue, ". . . as to whether the testing laboratory adhered to generally accepted techniques, addresses matters that properly go to either the admissibility or the weight to be given the evidence in a particular case, not admissibility under *Frye."* *Vandebogart,* 136 N.H. 365, 616 A.2d 483, 490 (1992). Therefore, this court has applied the two prong test of *Frye,* that is: (1) Is the scientific theory generally accepted in the relevant scientific community, and (2) Are there techniques or experiments that currently exist that are capable of producing reliable results which are generally accepted in the scientific community.

4. The defendant has cross-examined the various witnesses regarding the specific techniques used in testing the specific pieces of evidence in this case. In some instances the defendant has challenged whether the technique used in this particular case was in conformity with the generally accepted scientific techniques used for DNA testing. Unlike the lab in *State v. Schwartz,* 447 N.W.2d 422 (Minn.1989), the FBI and State Crime Lab adequately followed the techniques set forth by TWGDAM and the NRC. (*See* Finding 10). The procedures and techniques used by the labs in this case were standardized and pursuant to generally accepted standards, controls and practices. This court finds that sufficient foundation has been established by the state for the admissibility of the DNA analysis process and results in this case.

5. DNA is an organic substance found in the chromosomes in the nucleus of a cell. It provides the genetic code which determines a person's characteristics. Research laboratories have been conducting DNA analysis for years but the forensic use is more recent.

This court will not set out the scientific explanation of DNA herein but adopts the "brief genetic and biological primer" from *People v. Wesley*, 140 Misc.2d 306, 533 N.Y.S.2d 643 (Co.Ct.1988), and *Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436, 437–39 (1990), attached hereto as Appendix A. The description therein is in conformity with the evidence provided by the witnesses at the evidentiary hearing in this matter.

6. The scientific theory of DNA and its ability to allow a distinction between one individual and another is generally accepted in the relevant scientific community of molecular biologists, human geneticists, biochemists, and DNA forensic scientists. There has been no credible evidence presented or case law cited which indicates to the contrary, and in fact, the evidence is overwhelming that the scientific theory is generally accepted. Therefore, the first prong of the *Frye* test has been established. *People v. Axell*, 235 Cal.App.3d 836, 1 Cal.Rptr.2d 411, 423 n. 8 (1991).

7. The second prong of *Frye* requires a determination as to whether there are techniques, experiments and procedures that currently exist that are capable of producing reliable results that are generally accepted in the scientific community. Generally in DNA analysis and in its application to this specific case, there are three steps:

*Step 1—Processing:* Processing of the DNA is performed from known and unknown samples to produce films which indicate the lengths of polymorphic fragments.

*Step 2—Matching:* Matching the DNA patterns is done to see, for example, if a known and unknown sample match that links a suspect to a crime scene.

*Step 3—Statistical Analysis:* Statistical Analysis is performed to determine the significance of a match by determining the likelihood of a random match.

8. *Step 1—Processing:* Processing has six substeps which constitute the laboratory techniques developed from the theory of DNA analysis. These substeps are as set forth in *People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731, 734 (1992), as follows:

*Substep 1—Extraction:* Human bodily materials such as hair roots, blood, semen, and skin contain DNA. When chemical enzymes are added to these materials they result in an extraction or removal of the DNA from its bodily source.

*Substep 2—Restriction:* The extracted DNA is "cut" into thousands of fragments at specific points by application of restriction enzymes. The restriction enzymes act as "chemical scissors" in that they sever the DNA at target base-pair sites. This substep gives its name to the overall DNA analytical process: restrictive fragment length polymorphism (RFLP) analysis.

*Substep 3—Electrophoresis:* The DNA fragments are separated by size through a process called electrophoresis. The various sample fragments being tested are placed in separate lanes on one end of a gel slab and an electrical current is applied, causing the fragments to move across the gel. Shorter fragments move farther than longer fragments. Thus, at the completion of electrophoresis, the sample fragments are arrayed across the gel according to size. In addition to the sample fragments, other fragments called size markers, which have known base-pair lengths, are placed in separate lanes on the gel in order to facilitate measurement of the sample fragments. The array of size markers across the gel provides points of comparison which permit assessment of the base-pair lengths of the sample fragments.

*Substep 4—Southern Blotting or Southern Transfer:* (This substep was named for the scientist who developed it.) To facilitate the handling of the DNA fragments, a nylon membrane is placed on the gel, and by wicking action the fragments are transferred to the membrane, becoming permanently fixed in their respective positions. During this step each DNA fragment is separated at its bases into two parts—that is, it is "unzipped" from its double strand to two single strands by a process called denaturing.

*Substep 5—Hybridization:* This substep and substep six, Autoradiography, allow the DNA to be visualized. These two substeps enable visualization of the DNA fragments by producing x-ray films which show the distance the fragments traveled as a result of the electrophoresis. In the hybridization substep, four types of radioactive single-stranded DNA fragments called "probes", which have known base-pair sequences that occur at only one location on DNA, are applied to the nylon membrane. The probes seek out sample fragments that have complementary base-pair sequences and attach to them. Each type of probe will normally attach to two sample fragments, one contributed by each parent. Occasionally, however, where parents contributed the same information (i.e. identical fragments) for a particular trait, the probe will attach only to one fragment. In the former situation the polymorphic locus is said to be heterozygous, in the latter case it is said to be homozygous. *Substep 6—Autoradiography:* The hybridization process is repeated four times, once for each of the four probe types. Each time, an x-ray film called an "autoradiograph" or "autorad" is made of the nylon membrane, so that there are four x-ray films. (See Exhibits 7, 8, 9, and 10.) An attached probe's radioactivity will reveal the location of the probe—and hence the location of the sample fragment to which it attached—on the nylon membrane. The radioactivity shows up as a line or band on the x-ray film. There will normally be two bands of each of the four probes, producing a total of eight bands arrayed across the four films. Occasionally, where a locus is homozygous, there will be only one band for the probe. The location of a band on the x-ray film indicates the distance a fragment traveled as a result of electrophoresis, and hence the length of the fragment. The size-marker fragments also appear on the films, enabling measurement of the base-pair lengths of the sample fragments.

9. The end result of the processing substeps is a picture of a person's DNA pattern. Each pattern consists of a series of bands representing a few selected pieces of DNA. The bands are arrayed in varying positions, which indicate the distance the selected DNA fragments traveled during electrophoresis and hence the various lengths of the fragments. *Barney,* 10 Cal.Rptr.2d at 736.

10. The court finds that the RFLP processing steps are routinely performed and that the six processing substeps described above are generally accepted techniques in the relevant scientific community. The procedures and protocols are reliable and substantially in compliance with the recommended procedures of the Technical Working Group on DNA Analysis Methods ("TWGDAM") and the recommendations of the National Research Council in *DNA Technology in Forensic Science* (April 1992). The TWGDAM and NRC guidelines are just that, guidelines and recommendations. The defendant has questioned procedures used by the FBI and the State Crime Lab in this case. However, the questions regarding procedures, including but not limited to, proficiency testing, bias, ethidium bromide, band shifting, contamination, degradation, and others were answered by the witnesses, credibly establishing that the procedures and techniques used by the laboratories are generally accepted techniques.

11. *Step 2—Matching:* Having processed the known and unknown samples of DNA, the next step is to determine whether a known sample, such as that of a suspect, matches the DNA pattern of the unknown sample from the crime scene. This is done in two substeps.

*Substep 1—Visual:* First the examiner looks at the patterns on the autorad to determine if a match exists. As described by Dr. Lindsey in the hearing in this case and demonstrated by the sample autorads she used, the exclusions are usually obvious by viewing the bands. There is a minimal amount of subjective analysis as the interpretation of bands on the autorads is straightforward. In addition, the autorads continue to exist and can be reviewed and interpreted by others to verify accuracy. If there is a visual exclusion then the DNA analysis ends. If there is no visual

exclusion the matching analysis proceeds to the next step.

*Substep 2—Sizing:* The bands are evaluated for length measured in base pairs. This is done with the assistance of a computer. Known base pair lengths exist and they are compared with the bands of the sample fragments. Because an exact measurement of the base pairs of a sample fragment is not always possible a margin of error is built into the matching system. This is called the "matching window". The FBI will declare a match if the fragments differ by less than 2.5% plus or minus. If a match is determined after the visual match and sizing it means that a suspect is not excluded. A "match" does not mean that a suspect was definitely the source of the genetic material found at the crime scene but indicates the suspect cannot be eliminated or excluded as a potential source.

12. The court finds that there is general acceptance in the scientific community as to the techniques and processes to be employed in declaring a match of DNA pattern by the RFLP process. The defendant questioned the witnesses regarding the size of the match window, band shifting, the possibility of false positives, missing, light or indistinct bands or extra bands, and other matters. The witnesses credibly explained how any of these factors were accounted for in the procedures to provide the most accurate reading and resolve any ambiguity that might exist in favor of exclusion rather than inclusion. *State v. Jobe,* 486 N.W.2d 407, 419–20 (Minn. 1992).

13. *Step 3—Statistical Frequency:* The third and final step in DNA analysis is an analysis of the statistical frequency. The statistical frequency provides information as to the probability a person, other than the suspect, that is, a random person from the population, would have a DNA profile matching the suspect's at the same locations. The suspect's alleles are compared against allele frequencies from developed population databases. It is this final step that has caused the most recent analysis under *Frye* by the courts, that is, is there general acceptance in the scientific community of the techniques or methods for arriving at the statistical frequency.

14. The relevant scientific community for reference as to whether there is general acceptance of the techniques and methods used for arriving at statistical frequency of a DNA match is that of human population geneticists.

15. The "Fixed Bin Analysis" is relied on by the FBI to determine the likelihood of a random match. It assigns to each band in a DNA profile a value or frequency that represents how often a particular allele may occur at a specific VNTR locus in a given population. To determine population frequencies for particular alleles at particular VNTR loci the FBI uses four data bases, Caucasian, Black, and two Hispanic groups. To do the calculation, the "product rule" is applied to estimate the probability of a random match. The product rule is based on the assumption that each individual's alleles constitute statistically independent evidence and its validity rests on the absence of population substructure. *State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483 (1992).

16. This court has considered the testimony of Dr. Chakraborty at the hearing in this matter, as well as the numerous scientific articles, decisions, and testimony from other jurisdictions. The history of the admission of DNA evidence indexed solely on the statistical frequency issue seems to fall into three general categories. With some exceptions, courts initially admitted DNA evidence, including the statistical frequencies offered by scientists from labs such as Cellmark, Lifecodes, and the FBI. However, a debate began to brew as scientists and courts began to evaluate the statistical frequencies being given in the forensic arena. In the scientific community, the matter reached a summit in December of 1991 when two counter articles were published in a leading scientific journal, Science. Richard C. Lewontin of Harvard University and Daniel L. Hartl of Washington University questioned the reliability of DNA statistical analysis in their article, *Population Genetics in Forensic DNA Typing.* Randjit Chakraborty of the University of Texas and Kenneth K. Kidd of

Yale University answered in their article, *The Utility of DNA Typing in Forensic Work.* The debate centers around substructure and the multiplication or product rule.

17. Lewontin and Hartl have asserted that multiplying together the frequencies with which each band appears could be based on incorrect assumptions that members of racial groups mate at random and that the DNA fragments are in linkage equilibrium. Chakraborty and Kidd assert that although there is substructuring within the data bases, its effect does not impact the statistical analysis. This court has heard testimony from Dr. Chakraborty that is very convincing that, although Lewontin and Hartl raised these concerns, sufficient time has passed and work done to establish that the concerns are not valid and the Fixed Bin method of statistical frequency analysis with the FBI data base is now generally accepted by the scientific community.

18. The National Research Committee on DNA Technology was composed of a cross section of scientists familiar with the issues involved in forensic use of DNA evidence. The National Research Council is an organization administered by the National Academy of Sciences, the National Academy of Engineering and the Institute of Medicine. In April of 1992, the group issued a report entitled *DNA Technology in Forensic Science.* (The NRC report is attached hereto as Exhibit B.) The group's recommendations and conclusions are summarized at the beginning of the report, with more detailed discussion following. With regard to the underlying principles of DNA statistical frequency, the NRC report states as follows:

> Because any two human genomes differ at about 3 million sites, no two persons (barring identical twins) have the same DNA sequence. Unique identification with DNA typing is therefore possible, in principle, provided that enough sites of variation are examined. However, the DNA typing systems used today examine only a few sites of variation and have only limited resolution for measuring the variability at each site. There is a chance that two persons have DNA patterns (i.e., genetic types)

> that match at the small number of sites examined. Nevertheless, even with today's technology, which uses 3–5 loci, a match between two DNA patterns can be considered strong evidence that the two samples came from the same source. Interpreting a DNA typing analysis requires a valid scientific method for estimating the probability that a random person by chance matches the forensic sample at the sites of DNA variation examined. To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless. The committee recommends approaches for making sound estimates that are independent of the race or ethnic group of the subject.

NCR Report at 9. The committee sets forth the differing viewpoints regarding the basis of reliable statistical frequency estimates in its consideration of what is appropriate for forensic use at the time of the report. *Id.* at 14, 89. The committee comments, and the testimony before this court, indicate that the developing path points in the direction of the views of Chakraborty and Kidd, in that recent work indicates that the multiplication of gene frequencies across loci does not lead to major inaccuracies when assigning statistical frequency. It is likely that in the near future studies will result in general acceptance in the scientific community of the FBI's statistical frequency estimates with the Fixed Bin Method.

19. However, the NRC has recommended the conservative approach for the present use in forensics. It assumes that population substructure may exist in light of the scientific discussion regarding the matter and developed a method of estimating population frequencies that accounts for it. NCR Report at 89–95. The "Ceiling Principle" provides a method of calculating that is fair toward suspects because the estimated probabilities are likely to be conservative in their incriminating power. *Id.* at 85. Until further population studies are completed, the NRC recommends that courts use a conservative modification of the ceiling principle, also known as the "Modified Ceiling Principle" or the "Interim Ceiling Principle." *Id.*

at 91–93. This method requires three steps which eliminate the possibility that the resulting estimate will be affected by population substructure: (1) use of a 95% confidence limit to accommodate for any sampling error in the database, (2) creation of a composite genotype of at least three databases, using the highest frequency of any of the databases for the particular genetic markers studied and (3) where any frequency is less than 10%, substitution of a 10% floor for the actual percentage in the database.

20. The FBI has provided this court with a statistical frequency using the Modified Ceiling Principle. According to the testimony the three steps set forth above were all utilized. It used databases on at least three major races. The data base has been examined for evaluation of Hardy–Weinberg equilibrium and linkage disequilibrium. The 95% confidence limit, which is more accurately a 97.5% confidence limit, was applied. The principle of the 10% floor was utilized as well. Two methods exist for obtaining the allele frequencies used to determine the probability of a random match. These are the "Fixed Bin Method" and the "Floating Bin Method". NCR Report at 85–96. The testimony established, and the report indicates, that both methods are generally accepted in the relevant scientific community.

21. The court finds that this Modified Ceiling Principle, computed in a manner consistent with the NRC Report, is generally accepted in the relevant scientific community of population geneticists and forensic DNA scientists as a highly conservative estimate of random DNA pattern matches in which any error favors the suspect. *Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311, 316 (1992). The primary criticism of the Modified Ceiling Principle is that the statistical frequency that is produced by the method does not produce the best estimate science can provide to the courts, but the most conservative estimate. This is the point at which Science and the Law have difficulty finding common ground. The Law asks for the DNA random match statistical frequency that results from theory and method that is generally accepted in the scientific community. It does not ask for the most accurate result or the best estimate of statistical frequency. Therefore the law asks what theory and method produce a DNA random match statistical frequency that scientists generally agree on as accurate. In May of 1993, this court finds that the Modified Ceiling Principle represents a method, although conservative, that is generally accepted by the relevant scientific community for providing a statistical frequency of a random match. The law does not require that the method be absolutely, universally accepted, but that it be generally accepted. In the evidence presented to this court both in oral and written form it is abundantly clear that the Modified Ceiling Principle rests firmly on the acceptance side in the scientific community.

22. The court finds that the Modified Ceiling Floating Bin statistical frequency calculations for the RFLP matches in this case, as provided by the FBI report, will be admissible. The numbers reflect the NRC Modified Ceiling Principle using the Floating Bin Method, which is a generally accepted technique, to generate a population frequency for the RFLP results in this case. The evidence that Q–3, the panty stain, under application of RFLP technical analysis and application of the NRC Modified Ceiling Principle with Floating Bin method, has a statistical frequency of 1 in 20,000 is admissible. Testimony of Dr. Lindsey. The evidence that a three probe match, as the RFLP technical analysis produced for Q–3, the panty stain, has a statistical frequency of 1 in 125,000 using the NRC Modified Ceiling Principle is also admissible.

23. The state has indicated that it is its intention to introduce evidence of a one probe match as to Q–1 and Q–2, the anal swabs, but not provide the jury with a statistical frequency of a random match as to this evidence. The literature and case law firmly establish that evidence of a DNA match "will not be admissible if it is not accompanied by a population frequency estimate that has been produced from a generally accepted method". *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483, 494 (1992). Those cases which have denied admissibility of DNA evi-

dence, prior to the use of the Modified Ceiling Principle, did so even where there was a match on the basis that the statistical frequency method had not gained general acceptance in the scientific community. In other words, evidence obtained from Step 1 and Step 2, as described in paragraphs 7 through 11 above, is not admissible without Step 3, statistical frequency. Evidence of a match without the statistical frequency is not probative. In *People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731, 742 (1992) (quoting the NRC report at 74), the court stated,

> The statistical calculation step is the pivotal element of DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns.

Evidence of exclusion or absence of a match is probative evidence without any showing of the likelihood of a match occurring. Evidence excluding other suspects is therefore admissible in this case. Once a negative or no match is ascertained, the scientific technique stops, there is no statistical frequency analysis, and the evidence of exclusion is probative because the suspect is excluded. However, the opposite side of the coin does not follow, for if there is a match the scientific technique must continue to Step 3, and the match only has probative meaning if the statistical frequency analysis is provided. Therefore, any evidence of a "match" must include the statistical frequency in conformity with this opinion. Evidence of RFLP analysis of Q–1 and Q–2, a one-probe match, will only be admissible if a statistical frequency computed by the NRC Modified Ceiling Principle is provided to the jury. If the state intends to admit evidence as to Q–1 and Q–2 from the RFLP analysis consistent with this opinion, notice shall be given to the court and counsel no later than May 10, 1993, including the statistical frequency. Any evidence of exclusion or absence of a match, however, will be admissible alone as probative. *Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311 (1992).

24. The defendant argues that even if the RFLP/DNA evidence is eligible for admission under *Frye*, Alaska Evidence Rule 403 prevents its admission in this case. This court has considered the "probative v. unfair prejudice" balancing set forth in Rule 403. The RFLP analysis evidence is admissible to establish identity, the issue central to the state's case. The court finds that the evidence is highly probative compared to the danger of unfair prejudice. The jury may place little or no weight on the scientific testimony or substantial weight, as is their prerogative. This evidence may not alone prove identity, but is part of the circumstances which the state may present for the jury to consider.

DATED this 30th day of April, 1993, at Fairbanks, Alaska.

/s/ Niesje J. Steinkruger
NIESJE J. STEINKRUGER
Superior Court Judge

## APPENDIX B

### THE SUPERIOR COURT FOR THE STATE OF ALASKA
### FOURTH JUDICIAL DISTRICT

STATE OF ALASKA, Petitioner,

vs.

STEPHEN J. HARMON, Appellee.

Case No. 4FA–S92–2481 CR

### DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS DNA/PCR IDENTIFICATION EVIDENCE

The defendant has moved to suppress evidence the state intends to offer at trial that results from DNA/PCR DQ Alpha HLA testing. This court held an evidentiary hearing pursuant to *Frye v. United States*, 293 F. 1013, (D.C.Cir.1923), and *State v. Contreras*, 674 P.2d 792 (Alaska App.1983), *rev'd on other grounds*, 718 P.2d 129 (Alaska 1986). The court heard the testimony of Detective Lantz Dahlke, Detective Timothy Hunyor, Dr. Jenifer Lindsey, Dr. Randjit Chakroborty, Dr. Cecelia Von Beroldingen, Joe Ronald Urbanovsky, Leanne Strickland, Robert Thompson, John Murdock, and Brian Wraxall. In addition, this court has considered the numerous scientific articles, affidavits, transcripts, and other exhibits submitted by the parties, as well as the case law cited and

the arguments of counsel. Based upon all of the above, the court makes the following findings of fact and conclusions of law:

1. The state seeks to admit evidence at trial which results from deoxyribonecleic acid (DNA) analysis using the process called PCR (polymerase chain reaction) HLA DQ Alpha. The defendant alleges that the PCR HLA DQ Alpha analysis does not meet the evidentiary standards for admissibility.

2. The court incorporates Paragraphs 2, 3, 4, 5, and 6 from the Decision and Order regarding RFLP evidence as the statements therein hold true for PCR HLA DQ Alpha analysis in this case.

3. The RFLP process for DNA analysis attains the most discriminating results although it is costly, complex, time consuming, and requires large and nondegraded specimens. The recently developed PCR HLA DQ Alpha analysis is useful because it can be used with smaller biological samples, is less expensive, and the results are easy to interpret. The process is summarized in *State v. Williams,* 252 N.J.Super. 369, 599 A.2d 960, 966 (1991), as follows:

> The PCR technique was developed in 1985 by Cetus Corporation, which developed an inexpensive kit that has a simplified procedure to amplify a specific region of DNA in a sufficient quantity to allow for its analysis. In a matter of hours a targeted segment of DNA can be amplified in exact replicas a millionfold which can then easily be analyzed. A scientist can select any section of interest from a DNA molecule, typically a single set of genes, and amplify only that part. The result is that fragments of DNA formerly too small to analyze can now be amplified and easily analyzed. Currently there is only one PCR based genetic marker system commercially available for forensic analysis, which is the HLA DQ Alpha test system produced by Cetus Corporation.... The HLA DQ Alpha typing system works in that a person's genotype is detected by what is called a reverse dot blot method. The significant advantage of this system is that it is easy to standardize its results, which removes the risk of typing errors.

Indeed, those using the PCR technique are constantly subjected to "blind" testing to measure the accuracy of the results and they have been almost unanimously positive.

4. The second prong of *Frye* requires a determination as to whether there are techniques, experiments, and procedures that currently exist that are capable of producing reliable results that are generally accepted in the scientific community. There are three steps in the PCR process used in this case:

*Step 1—Extraction:* The DNA is extracted from samples of blood, sperm, hair, or other body tissues with solvents and chemicals. A centrifuge is used to separate the DNA material from the unnecessary material for PCR testing.

*Step 2—Amplification:* The small quantity of isolated DNA is added to the buffer solution containing chemical primers and an enzyme called "TAQ polymerase". This solution is placed in a thermal cycler which cycles the solution through successive temperature levels. The process results in reproducing the DNA fragment making millions of copies of this region of DNA.

*Step 3—Typing:* Nine "allele-specific" probes are attached to a nylon membrane, and the amplified DNA is flooded over it. The probes are designed to recognize each of the variants of the "gene of interest" which, in this case, was "DQ Alpha". The probes "light up" in the presence of the variants for which they are specific. This genetic marker system has six "traits", designated, respectively, as 1.1, 1.2, 2, 3, and 4. These traits are combined in parts in each individual, because one trait is received from each parent. There are, according to the expert testimony, 21 possible combinations of these traits. These pairings are called "genotypes". The purpose of the typing is to identify the genotype present in the DNA amplified in Step 2. *Spencer v. Commonwealth,* [240 Va. 78] 393 S.E.2d 609, 620 (Va.), *cert. denied,* 498 U.S. 908 [111 S.Ct. 281, 112 L.Ed.2d 235] (1990). Most labs use a kit developed by Cetus Corporation. The kit uses "reverse dot hybridization" as its detection method.

4. The court finds that the PCR/HLA DQ Alpha analysis steps set forth above are routinely performed and are generally accepted in the relevant scientific community of molecular biologists, DNA forensic scientists, biochemists, and population geneticists. The procedures and protocols are reliable and substantially in compliance with the recommendations of the National Research Council and other DNA working groups. The witnesses, Dr. Lindsey, Leanne Strickland, and Dr. Von Beroldingen, and the scientific literature candidly acknowledge the limitations of the HLA DQ Alpha analysis and openly point out the need for strict laboratory procedures to produce reliable results. The witnesses explained the controls that were used to insure reliable results generally and in these tests specifically. The questions on cross examination of the witnesses at the hearing regarding procedures, controls, proficiency testing, bias, contamination, degradation, allele dropout, thermocycler reliability, and other matters were answered and acknowledged or explained by the witnesses, credibly establishing that the procedures and techniques used by the laboratories are generally accepted techniques.

5. The court finds that there is general acceptance in the relevant scientific community that the PCR HLA DQ Alpha typing system has been shown to be a valid and reliable approach for forensic analysis of biological evidence. The recent cross validation studies between RFLP and PCR provide the most recent evidence of its scientific reliability for forensic purposes.

6. The statistical frequency used for application of the genotype identified by the HLA DQ Alpha analysis in this case comes from the FBI database, which is combined with the Cetus database. The question is "What is the likelihood that someone other than the defendant could have left the crime scene sample?" The method of determining the likelihood of a random genotype of the same reading, as described by Dr. Chakraborty and Dr. Lindsey, is generally accepted by the scientific community and contains the foundational requirements for admissibility. The state established by a preponderance of the evidence that the database is statistically valid and generally accepted as reliable. *See* last page of Ex. 41.

7. The court considered the probative versus unfair prejudice test set forth in Alaska Evidence Rule 403 and finds that the probative value of the PCR HLA DQ Alpha evidence outweighs any unfair prejudice which might occur from the scientific evidence. This evidence is offered by the state as a part of their case going to the identity of the perpetrator of this crime. The jury may place little or no weight on the scientific testimony or substantial weight, as is their prerogative. This evidence may not alone prove identity, but is part of the circumstances which the state may present for the jury to consider.

DATED this 30th day of April, 1993, at Fairbanks, Alaska.

/s/ Niesje J. Steinkruger
NIESJE J. STEINKRUGER
Superior Court Judge